(132 P.3d 985)

No. 93,084

STATE OF KANSAS, *Appellee,* v. NICHOLAS MOODY, *Appellant.*

Opinion filed April 28, 2006.

*Steven D. Rosel*, of Topeka, for appellant.

*Don L. Scott*, county attorney, and *Phill Kline*, attorney general, for appellee.

Before MALONE, P.J., GREEN and BUSER, JJ.

GREEN, J.: After a jury trial, Nicholas Moody was convicted of attempted first-degree murder, conspiracy to commit first-degree murder, aggravated intimidation of a witness, and conspiracy to commit aggravated intimidation of a witness. The court sentenced Moody to 155 months' imprisonment for attempted first-degree murder. It also sentenced Moody to concurrent sentences of 117 months for conspiracy to commit first-degree murder, 18 months for aggravated intimidation of a witness, and 8 months for conspiracy to commit aggravated intimidation of a witness. Moody timely appealed.

While on appeal, Moody moved this court to remand his case to the district court for a hearing regarding ineffective assistance of trial counsel. Moody alleged that his trial counsel was ineffective because he failed to: (1) present a videotaped statement of Travis Kohn, a State witness, to impeach the witness; (2) object to hearsay evidence presented by Gary Woodard's trial testimony; (3) interview or subpoena Isaac Rodriguez who could have testified on Moody's behalf; and (4) call an expert witness to testify about the effects of drug abuse on memory recall. In January 2005, this court remanded Moody's case to the district court under *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986), for a determination regarding his claims of ineffective assistance of trial counsel.

Following an evidentiary hearing, the district court held that Moody's trial counsel was effective and denied Moody's request for a new trial. The central issue on appeal is whether the evidence was sufficient to sustain Moody's convictions. We determine that the evidence was sufficient for a factfinder to conclude that Moody was guilty beyond a reasonable doubt of the charges. In addition, Moody contends that the trial court abused its discretion in determining that Moody's trial counsel was effective. We disagree. Moody further asserts that his convictions for conspiracy to commit first-degree murder and conspiracy to commit aggravated intimidation of a witness were multiplicitous. We disagree. Finally,

Moody maintains that his convictions for attempted first-degree murder and aggravated intimidation of a witness were multiplicitous. We disagree. Accordingly, we affirm.

*I. Was the Evidence Sufficient to Support Moody's Convictions?*

Moody asserts that the trial evidence was insufficient to support his convictions. Moody presumably argues that the evidence was insufficient to support all of his convictions as he has failed to specify any single conviction. The State argues that the evidence was clearly sufficient to show Moody acted knowingly and intentionally but does not discuss the evidence supporting the convictions.

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Calvin*, 279 Kan. 193, 198, 105 P.3d 710 (2005).

A conviction may be sustained only upon evidence where every element of a crime is proven beyond a reasonable doubt. *State v. Star*, 27 Kan. App. 2d 930, 934, 10 P.3d 37, *rev. denied* 270 Kan. 903 (2000). A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Holmes*, 278 Kan. 603, 632, 102 P.3d 406 (2004).

Moody essentially challenges the credibility of certain witnesses. He simply contends that the admitted drug usage and resulting memory difficulties of "key witnesses" raises questions as to the sufficiency of the evidence. Nevertheless, questions of credibility are solely the province of the jury. See *State v. Bledsoe*, 272 Kan. 1350, 1359, 39 P.3d 38 (2002). In reviewing the evidence for sufficiency, an appellate court cannot weigh the evidence or pass on the credibility of witnesses. *State v. Mays*, 277 Kan. 359, 363, 85 P.3d 1208 (2004). Thus, we decline Moody's invitation to reweigh the evidence or reassess the credibility of witnesses.

The evidence presented at trial was sufficient for a rational factfinder to have found Moody guilty beyond a reasonable doubt. The evidence established that on October 18, 2002, Kohn, Josh Talbert,

and Woodard traveled from Colorado Springs, Colorado, to Ulysses, Kansas, to visit Talbert's friend, Rodriguez.

According to Kohn, before they left Colorado, Talbert mentioned that Rodriguez wanted someone to kill Eric Pike. Therefore, Kohn decided to take two guns with him to Ulysses. Kohn stated that on October 19, 2002, Rodriguez asked him to kill Pike. Rodriguez and Kohn were alone when this conversation occurred. Kohn testified that Rodriguez wanted Pike killed because Pike was scheduled to testify against Rodriguez at a trial on charges of armed robbery. After Kohn agreed to kill Pike, Rodriguez took Kohn to Moody's house in Ulysses.

Kohn testified that Moody drove him to Liberal three times with the intent to kill Pike. Moody and Kohn were the only individuals involved in the plan who made the trips to Liberal. Kohn and Woodard testified that Moody drove Kohn to Liberal knowing that Kohn planned to kill Pike. Kohn testified that he got scared on the first two trips to Liberal and did not go through with the crime. On the way back to Ulysses after the first trip to Pike's house, Moody and Kohn discussed where Kohn could meet Moody after Kohn killed Pike. According to Kohn, Moody called Rodriguez on both return trips from Liberal. After the second trip to Liberal, Moody and Kohn returned to Moody's house. There, Rodriguez beat Kohn and told him that he would kill Kohn's girlfriend and Kohn's parents if Kohn did not kill Pike.

On October 21, 2002, Moody again drove Kohn to Pike's residence in Liberal. Rodriguez warned Kohn that Moody would be armed and would shoot him if he acted nervous. Moody kept his hand on a revolver in his lap the entire trip to Liberal. Kohn stated that he believed that Moody would shoot him if he did not kill Pike. When they got to Liberal, Moody told Kohn to load the gun stashed in the glove compartment and told Kohn that "after [he] did it, just run down that direction like hell and [Moody] would be there waiting." Moody dropped Kohn off at Pike's house. Kohn's attempt to kill Pike, however, was unsuccessful. Kohn knocked on Pike's door and pointed a gun at Pike's head when he opened the door. Kohn, however, stated that he had stuffed debris in the gun so it would misfire, but also denied ever pulling the trigger. After

this, Kohn ran to meet Moody, but he was gone. Kohn was later arrested.

Woodard testified that at some point during the weekend, Rodriguez told him that Moody had called and told him that there were so many police officers around Pike's house that Kohn could not "get to him." He also testified that on October 21, Rodriguez had told him that Moody had driven Kohn to Liberal so Kohn could kill Pike. Woodard stated that later that night, Moody showed up at Rodriguez' house "freaking out" because he had left Kohn in Liberal. According to Woodard, Moody said he heard two gunshots, saw two police cars, got scared, and then drove off and left Kohn. Moody's girlfriend, Ashley Colbert, testified that Moody called her the night of the incident and told her to go to his mother's house because something bad was likely to happen.

Pike testified that Kohn attempted to fire the gun, but it malfunctioned. The police officer who found Kohn's gun also testified that one of the rounds in the gun had an indentation off to one side but near the primer, indicating a misfire. Police Officer Delton Brown, who interviewed Moody after his arrest, testified that although Moody admitted driving Kohn to Liberal, Moody stated that he had not known Kohn's reason for going to Liberal.

Kohn admitted that he, Talbert, and Woodard had used a lot of drugs during the days preceding the attempted murder. Kohn stated that he had been high frequently on drugs over a period of 8 months before the incident. Kohn conceded that this drug usage had affected his long-term memory and his methamphetamine usage had definitely affected his memory. Woodard also admitted that he had been up for 7 days straight while using drugs before October 21.

Moody testified that Rodriguez had asked him to take Kohn to Liberal to pick up a car loaded with marijuana. Moody stated that he took Kohn to Liberal once on Saturday, but Rodriguez called on the way there and stated that the car was not ready. On October 21, Rodriguez told Moody that the car was ready. Hence, Moody drove Kohn to Liberal, dropped him off, and drove back to Ulysses.

To prove that Moody had committed the crime of attempted first-degree murder, the State was required to prove (1) that

Moody performed an overt act toward the commission of first-degree murder—an intentional and premeditated killing; (2) that he did so with the intent to commit first-degree murder; (3) that Moody failed to complete the commission of this crime; and (4) that this act occurred on or about October 21, 2002, in Seward County, Kansas. See K.S.A. 21-3301; K.S.A. 21-3401; PIK Crim. 3d 55.01; PIK Crim. 3d 56.01.

A person who intentionally aids and abets another in the commission of a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime. K.S.A. 21-3205(1); *State v. Dunn*, 243 Kan. 414, 431, 758 P.2d 718 (1988). Intent may be inferred from circumstantial evidence. 243 Kan. at 431. A person who aids and abets in the commission of a crime may be charged and convicted as a principal. *State v. Smolin*, 221 Kan. 149, 152, 557 P.2d 1241 (1976).

A review of the record reveals sufficient evidence existed to show that Moody knew why he was taking Kohn to Liberal and that Moody aided Kohn in his attempt to kill Pike. The evidence showed that Moody made the overt act of driving Kohn to Liberal with the intent for Kohn to kill Pike. Although Moody maintains that he did not know this was why Kohn wanted to go to Liberal, Kohn and Woodard's testimony established that Moody assisted in Kohn's attempt to kill Pike. The evidence further established that Kohn took the overt act of firing the gun at Pike.

To establish that Moody had committed the crime of conspiracy to commit first-degree murder, the State was required to prove (1) that Moody agreed with others to assist in the commission of the crime of first-degree murder; (2) that he agreed with the intent that the crime be committed; (3) that Moody or any party to the agreement acted in furtherance of the agreement; and (4) that this act occurred on or about October 21, 2000, in Seward County, Kansas. See K.S.A. 21-3302; PIK Crim. 3d 55.03. The evidence demonstrated that Moody agreed to assist in the killing of Pike. Moody acted in furtherance of the agreement by driving Kohn to Pike's house.

Finally, to prove that Moody had committed the crime of aggravated intimidation of a witness, the State had to prove (1) that Moody prevented or dissuaded or attempted to prevent or dissuade Pike from giving testimony at a trial; (2) that the act was accompanied by an expressed or implied threat of force or violence against Pike or done in furtherance of such a conspiracy; (3) that Moody did so knowingly and maliciously; and (4) that this act occurred on or about October 21, 2002, in Seward County, Kansas. See K.S.A. 21-3833; PIK Crim. 3d 60.06-B. Maliciously means done with an intent to harm or injure another person or with an intent to thwart or interfere in any manner with the administration of justice. PIK Crim. 3d 60.06-B. Likewise, to establish that Moody had committed conspiracy to commit aggravated intimidation of a witness, the State was required to prove the elements of conspiracy with regards to the commission of aggravated intimidation of a witness. See K.S.A. 21-3302; K.S.A. 21-3833.

Here, the evidence established that Moody drove Kohn to Pike's house with the intent to kill Pike. Kohn's testimony showed that Kohn was attempting to kill Pike at Rodriguez' request to keep him from testifying at Rodriguez' trial. Although there was no testimony clearly establishing that Moody was acting to prevent Pike from testifying, "[s]pecific intent may be shown, however, by 'acts, circumstances and inferences reasonably deducible therefrom and need not be established by direct proof.' [Citation omitted.]" *State v. Johnson*, 258 Kan. 61, 67, 899 P.2d 1050 (1995). Hence, a rational factfinder could have inferred that Moody had acted with the intent to prevent Pike from testifying at Rodriguez' trial. The evidence showed that Moody knowingly and intentionally aided Kohn in Kohn's attempt to kill Pike in order to prevent Pike from testifying.

Finally, the crime of conspiracy contains two essential elements: "(1) an agreement between two or more persons to commit or to assist in committing a crime and (2) an overt act in furtherance of the conspiracy committed by one or more of the conspirators." *State v. Daugherty*, 221 Kan. 612, 619, 562 P.2d 42 (1977).

" 'To establish a conspiracy it is not necessary that there be any formal agreement manifested by formal words, written or spoken; it is enough if the parties

tacitly come to an understanding in regard to the unlawful purpose and this may be inferred from sufficiently significant circumstances.' [Citation omitted.]
"Further, 'while an agreement is a necessary element of a conspiracy, the existence of the agreement does not need to be proved directly but may be inferred from other facts proved.' [Citation omitted.]" *State v. Hernandez,* 24 Kan. App. 2d 285, 291, 944 P.2d 188, *rev. denied* 263 Kan. 888 (1997).

Again, although there was no direct evidence establishing an agreement on Moody's behalf to prevent Pike from testifying, a rational factfinder could have inferred that Moody had agreed to assist in the killing of Pike to prevent him from testifying at Rodriguez' trial. Again, Moody acted in furtherance of the agreement by driving Kohn to Pike's residence.

In summary, after review of all the evidence, when viewed in the light most favorable to the State, the evidence was sufficient for a rational factfinder to have found Moody guilty of all charges beyond a reasonable doubt.

## II. Did the Trial Court Err in Determining Moody's Trial Counsel was Effective?

Moody next contends that the trial court erred in finding that he received effective assistance of trial counsel. A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. We must determine whether the trial court's findings of fact have substantial support in the evidence and whether the trial court's conclusions of law follow as a matter of law from those facts. *State v. Davis,* 277 Kan. 309, 315, 85 P.3d 1164 (2004).

In a case involving an issue of ineffective assistance of counsel, the *Davis* court explained the hurdles that a defendant must clear:

" 'Before counsel's assistance is determined to be so defective as to require reversal of a conviction, the defendant must establish two things. First, the defendant must establish that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel's performance was less than that guaranteed to the defendant by the Sixth Amendment to the United States Constitution. Second, the defendant must establish that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial.' " 277 Kan. at 314 (quoting *State v. Orr,* 262 Kan. 312, Syl. ¶ 1, 940 P.2d 42 [1997]).

Moreover, as our Supreme Court has observed, a strong presumption exists that counsel's conduct comes within the scope of reasonable professional assistance:

"Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation omitted.] To show prejudice, the defendant must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. [Citation omitted.]" *State v. Betts*, 272 Kan. 369, 387-88, 33 P.3d 575 (2001).

With these standards firmly in mind, we turn now to the merits of this issue.

A. *Failure to Submit the Video of Kohn's Interview*

Moody contends that his trial counsel, Greg Swanson, was ineffective for failing to impeach Kohn's trial testimony with a previously videotaped statement Kohn furnished Detective Mease.

At trial, Kohn testified that after he pulled the gun on Pike, he ran away, then stuffed the gun in a mailbox to hide it. On cross-examination, defense counsel elicited that Kohn had originally told the police that putting the gun in the mailbox was part of the plan. Nevertheless, Kohn admitted that that statement had been a lie because he had not previously planned to put the gun in a mailbox. Swanson further elicited on cross-examination that Kohn had varied his story to the police about payment amounts that Rodriguez had offered Kohn to kill Pike and the reasons why he had attempted to kill Pike.

The district court found that Moody had failed to describe any material inconsistencies in the video. Moreover, the district court noted that Moody had failed to introduce the video at the evidentiary hearing. Without this evidence, the court determined it could not speculate that counsel was ineffective for not presenting the video or calling Mease at the trial. The district court also stated that a review of the trial transcript revealed that Swanson had elicited two inconsistencies in Kohn's testimony during cross-examination.

Likewise, Moody has not presented this court with the video of Kohn's interview. Moreover, Moody has failed to furnish this court with any information as to what the video or Mease's testimony would have revealed beyond the inconsistencies Swanson had elicited during Kohn's cross-examination. The burden is on an appellant to furnish a record which affirmatively shows that prejudicial error occurred in the trial court. Without such a record, an appellate court presumes the action of the trial court was proper. *Holmes*, 278 Kan. at 612.

Moody possesses the burden to establish that Swanson's representation was ineffective. See *Davis*, 277 Kan. at 314. Mere conclusory statements are insufficient to satisfy this burden. *State v. Jackson*, 255 Kan. 455, 463, 874 P.2d 1138 (1994). The record reveals that Swanson effectively cross-examined Kohn, revealing inconsistencies in his statements to police officers and that he lied to police officers. Moody has failed to show that Swanson's performance was deficient for failing to present the video or to call Mease to testify at trial.

## B. *Failure to Object to Hearsay Testimony*

Moody argues that Swanson was ineffective because he failed to object to hearsay evidence admitted during Woodard's testimony.

As a preliminary matter, Moody contends that "numerous" instances existed where hearsay was admitted at his trial. Nevertheless, Moody only argues that Swanson was ineffective for failing to object to one specific segment of testimony. An issue not briefed by an appellant is deemed waived or abandoned. *Holmes*, 278 Kan. at 622. We decline Moody's invitation to search the trial transcript for his trial counsel's other alleged failures to object to hearsay testimony.

In his motion for remand, Moody contended that there were several times when Swanson should have objected to hearsay evidence. Nevertheless, Moody only specified Swanson's failure to object to Woodard's testimony regarding Rodriguez' statement. The district court found no error in Swanson's failure to object to hearsay evidence at trial. The district court determined that Woodard's testimony regarding statements made by Rodriguez was ad-

missible as a statement of a coconspirator under K.S.A. 60-460(i)(2). The district court also held that Woodard's testimony regarding statements Rodriguez claimed Moody made was admissible as multiple hearsay under K.S.A. 60-463 and also met the exception to hearsay under K.S.A. 60-460(g) and K.S.A. 60-460(i)(2). The court finally determined that Woodard's testimony about statements made by Talbert was admissible under K.S.A. 60-460(a) because Talbert testified at the trial and was available for cross-examination. The court further found that all of the other hearsay statements referring to the overall plan to kill Pike were admissible under the coconspirator exception to the hearsay rule.

On appeal, Moody contends that Swanson was ineffective because he failed to object to Woodard's testimony that Rodriguez had implicated Moody as a participant in the plan to kill Pike. At trial, Woodard testified that on the night of the incident, Rodriguez explained to him that Moody had driven Kohn to the crime scene. Woodard further testified that Rodriguez told him that Moody had freaked "out because he ended up leaving [Kohn] in Liberal." According to Woodard, Rodriguez stated that Moody told him that he had heard two gunshots and saw police cars quickly proceeding in the direction of the victim's residence. This scared Moody and caused him to flee the scene. Swanson objected to this testimony on the grounds that it was nonresponsive to the question. The district court sustained the objection.

Swanson testified at the evidentiary hearing that he knew before trial that a large amount of hearsay testimony would be admissible under the coconspirator exception. He maintained that he and Moody had discussed not objecting to this hearsay evidence as part of their trial strategy, allowing Moody to give hearsay testimony regarding what Rodriguez had told him. Moody admitted at the hearing to having this discussion with Swanson.

K.S.A. 60-460(i)(2) allows hearsay evidence where the statement was made while "the [defendant] and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination." The coconspirator exception is a firmly

rooted hearsay exception. See *State v. Swafford*, 257 Kan. 1023, 1040, 897 P.2d 1027 (1995), *modified on other grounds* 257 Kan. 1099, 913 P.2d 196 (1996). Our Supreme Court has established five prerequisites to the proper admission of a coconspirator statement:

"(1) the person testifying must be a third party; (2) the out-of-court statement about which the person will testify must have been made by one of the coconspirators; (3) the statement of the coconspirator must have been outside the presence of the accused; (4) the statement of the coconspirator must have been made while the conspiracy was in progress; and (5) the statement must be relevant to the plan or its subject matter." *State v. Bird*, 238 Kan. 160, 176, 708 P.2d 946 (1985).

Moody maintains that Woodard's testimony was inadmissible under K.S.A. 60-460(i)(2) because it was made after the completion of the alleged conspiracy.

Our Supreme Court, however, has determined that hearsay statements made during an attempt to conceal a crime are admissible under K.S.A. 60-460(i)(2). See *State v. Flynn*, 274 Kan. 473, 509-10, 55 P.3d 324 (2002). In *Flynn*, the defendant argued that the trial court erred in admitting hearsay statements of a coconspirator at trial because the conspiracy was complete when the statements were made. According to *Flynn*,

" 'K.S.A. 60-460(i) codifies in substance the exception to the hearsay rule as stated in [*State v. Borserine*, 184 Kan. 405, 337 P.2d 697 (1959)]. In *Borserine* this court accepted the view that a conspiracy is not terminated when an attempt to conceal the offense is made. The acts and declarations of one conspirator in the prosecution of the crime or its concealment in the foregoing respects are considered the acts and declarations of all, and are evidence against all.' [Citation omitted.]" 274 Kan. at 509-10.

The *Flynn* court stated that an ongoing conspiracy may be established by circumstantial evidence. 274 Kan. at 510 (citing *Bird*, 238 Kan. at 176-77). Because ample circumstantial evidence existed to establish that the purpose of the statements offered against the defendant were made in an attempt to conceal the conspiracy, the *Flynn* court concluded that the trial court did not err in admitting the statements under K.S.A. 60-460(i)(2). 274 Kan. at 510.

Here, the circumstantial evidence established that Moody fled the scene in an attempt to conceal the conspiracy. Moreover, as stated earlier, Kohn testified that he ran from Pike's house and hid the gun in a mailbox to conceal the attempted murder and conspiracy. Rodriguez' statements provided to Woodard were made on the night of the crimes. Sufficient circumstantial evidence existed to establish that Rodriguez' statements to Woodard were made during the conspirators' attempt to conceal the offense.

As a result, Woodard's testimony was admissible under the hearsay exception in K.S.A. 60-460(i)(2). The statements satisfied the five requirements of *Bird*: (1) the person testifying—Woodard—was a third party; (2) the out-of-court statements were made by one of the coconspirators—Rodriguez; (3) the statements were made outside the presence of Moody; (4) the statements were made while the conspiracy was in progress; and (5) the statements were relevant to the conspirators' plan to kill Pike. Thus, Swanson's performance was not deficient for deciding not to object to Woodard's admissible testimony.

C. *Failure to Interview or Subpoena Isaac Rodriguez*

Moody contends that his counsel was ineffective for failing to call Rodriguez as a witness. Moody alleges that Rodriguez would have corroborated Moody's assertion that he had no knowledge of the attempt to murder Pike. Moody further contends that his counsel was ineffective for contacting Rodriguez' former counsel instead of talking to Rodriguez' current counsel.

Rodriguez testified at the evidentiary hearing that before Moody's trial, he told his attorney, Steve Upshaw, that he wanted to testify at Moody's trial. Rodriguez maintained that he would have testified that Moody was doing him a favor by taking Kohn to Liberal to pick up a car filled with marijuana. Nevertheless, according to Rodriguez, Swanson never spoke to him. Rodriguez admitted that he had pled no contest to conspiracy to commit attempted first-degree murder and aggravated intimidation of a witness, but asserted that he did not ask Kohn to shoot Pike.

Moody testified that he had asked Swanson to speak with Rodriguez because he thought Rodriguez' testimony would be helpful.

Nevertheless, Moody maintained that Swanson stated that Rodriguez would not be a good witness because he was the "bad guy in the situation." Swanson admitted that he and Moody had discussed which witnesses would be beneficial. Swanson did not recall Moody asking him to speak with Rodriguez. Swanson, however, spoke to Rodriguez' former counsel, Clint Peterson. Although Swanson did not recall his conversation with Peterson, he assumed that he was trying to discover what deals were made and if Rodriguez had agreed to testify for or against anyone. Swanson did not think he talked to Upshaw, who replaced Peterson as Rodriguez' attorney.

Swanson testified that neither Moody nor any of the other coconspirators' attorneys indicated that Rodriguez was prepared to testify on Moody's behalf. Swanson stated that Rodriguez had pled no contest and was sentenced just before Moody's trial.

The district court determined that Rodriguez' and Moody's testimony at the evidentiary hearing lacked credibility because they were friends. Moreover, they had had an opportunity to communicate before the hearing. The court further determined that despite Swanson's failure to speak to Upshaw before trial, there was no indication that Swanson had any reason to believe that Rodriguez would be willing to testify.

The decision whether to call a certain witness is a matter of trial strategy. See *Winter v. State*, 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 (1972). Moody bears the burden of establishing that Swanson's alleged deficiencies were not the result of strategy. See *State v. Gleason*, 277 Kan. 624, 644, 88 P.3d 218 (2004).

Although Swanson spoke with an attorney who no longer represented Rodriguez, Swanson testified that he had reviewed Rodriguez' case file and determined that Rodriguez would likely be unwilling to testify at Moody's trial because he had refused to talk about the incident in his own case. Moody even admitted at the evidentiary hearing that he had previously testified that Rodriguez was unwilling to talk. Moreover, Swanson testified that none of the coconspirators' attorneys, including Upshaw, stated that Rodriguez was willing to testify on Moody's behalf. Furthermore, Moody admitted that Swanson had provided him with a strategic reason for not calling Rodriguez as a witness. Moody has failed to prove that

the situation would have been different had Swanson spoke with Upshaw. Hence, Moody has failed to show that Swanson's decision not to call Rodriguez as a witness was anything beyond a strategical decision within the discretion of a trial attorney.

Moreover, the trial court stated that even if counsel was ineffective for speaking with Rodriguez' former counsel, Moody's assertion failed under the second prong of the test because Rodriguez' story lacked any indicia of credibility. Even if Swanson's performance was ineffective, Moody must also establish that there was a reasonable probability that, but for Swanson's trial errors, the result of the trial would have been different. *Gleason*, 277 Kan. at 644. This court cannot weigh a trial court's determination regarding credibility. See *Mays*, 277 Kan. at 363. Moreover, given the numerous admissions by witnesses that Rodriguez had asked Kohn to kill Pike and that Moody was involved in this conspiracy, there was no reasonable probability that Rodriguez' testimony would have changed the outcome of Moody's trial. As a result, Swanson's argument fails.

## D. *Failure to Call an Expert Witness*

Moody contends that his counsel was ineffective for failing to call an expert witness to discuss the effects of drug use on memory.

Moody called Wally Mechler, a drug and alcohol counselor, as a witness at his evidentiary hearing. Mechler testified that a prolonged drug-induced high can affect one's ability to perceive occurrences accurately. In Mechler's opinion, an individual's perception of events would be "suspect at best" when he admittedly abused methamphetamine for 8 months.

Swanson testified that he and Moody had developed a trial strategy to cross-examine the witnesses at length about how drug use would have affected their judgment and memory. Swanson saw no need for an expert witness because the coconspirators and other witnesses had admitted extensive drug usage in previous testimony, and he felt he could get them to admit this upon cross-examination. Swanson stated that Moody never requested or suggested an expert witness. Although Moody countered that he had asked Swanson to obtain an expert drug witness, Swanson responded that the jury

would have common knowledge of the damaging results of drug use, making an expert witness unnecessary.

The district court determined that an expert witness would have added very little beyond what Swanson brought out on cross-examination of witnesses. Consequently, the court held that there was no error in Swanson's decision to not hire an expert witness.

As stated earlier, whether to call a witness is a matter of trial strategy. *Winter*, 210 Kan. 597, Syl. ¶ 2. Moreover,

" '[t]he basis for the admission of expert testimony is necessity arising out of the particular circumstances of the case. To be admissible, expert testimony must be helpful to the jury. Where the normal experience and qualifications of lay persons serving as jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are inadmissible. [Citation omitted.] An expert's opinion, pursuant to K.S.A. 60-456, is admissible up to the point where an expression of opinion would require [the expert] to pass upon the credibility of witnesses or the weight of disputed evidence. [Citation omitted.]' " *State v. Arrington*, 251 Kan. 747, 752, 840 P.2d 477 (1992).

During cross-examination at trial, Swanson elicited detailed admissions of excessive drug usage and its damaging effects upon memory from Kohn and Woodard. Kohn admitted that he had used methamphetamine continually for 8 months and that it had definitely affected his memory while he was using the drug. Woodard revealed that he had been constantly awake and using methamphetamine for 7 days straight before the incident. He admitted that this caused some decision-making and memory problems.

Considering the above testimony, the district court determined that an expert witness, providing testimony in line with Mechler's testimony, would likely not have been helpful because the jury would have been able to draw this information from the testimony of Kohn and Woodard. Further, any expert testimony specifically attacking the credibility of Kohn and Woodard due to drug use would have been inadmissible.

Therefore, Swanson's performance was not deficient for making the determination that an expert drug witness was unnecessary. The record reveals Swanson effectively elicited Kohn's and Woodard's admission of their excessive drug use and its adverse effects upon their memories.

E. *Failure to Submit Moody's Interview as Rebuttal Evidence*

Moody alleges that trial counsel's failure to submit his video-taped interview with Mease as rebuttal evidence "was crucial and could have had an enormous impact on the decision making of the jury." Moody contends that the video would have revealed that a statement by the prosecutor during cross-examination of Moody was false.

During Moody's trial, he testified that while being interviewed by Mease after his arrest, he attempted to tell Mease that he drove Kohn to Liberal so Kohn could pick up a car loaded with marijuana. Nevertheless, Mease called Moody a liar and cut the interview short. Upon cross-examination, the State asked Moody, "And so if [the officers who conducted the interview] said in that interview that you said, 'Well, you knew something about some guy was supposed to get killed,' they wouldn't be telling the truth?" Moody denied making that statement to the officers. There was no objection to the State's question.

At the evidentiary hearing, Moody testified that he never admitted during the interview that he knew someone was going to get killed. Moody indicated that after the State's question, he asked Swanson to listen to the video of the interview and play the video in court. The video was never shown to the jury.

The video was played at the evidentiary hearing. Swanson testified that he did not recall Moody asking him to show the video to the jury. Although Swanson remembered watching the video of the interview with Moody in preparation for the trial, he did not recall watching the video during a recess at the trial.

The court determined that nothing positive for Moody had been revealed in the video. The video showed Mease calling Moody a liar for telling the same story that he had furnished at trial. The court determined that it would have been ineffective assistance of counsel if Swanson had shown the video at trial.

Moody has not included the video in the record on appeal. Moody has the burden to furnish a record that establishes prejudicial trial errors. See *Holmes*, 278 Kan. at 612. Because the video was not included in the record, this court presumes the action of the trial court was proper. See *Holmes*, 278 Kan. at 612.

Moreover, Swanson called the prosecutor's statement into doubt during his closing argument. Swanson stated that after asking Moody if he had made the admission during his interview, the State asked for a recess to bring in the video to show that Moody was lying. Nevertheless, Swanson argued that the State's decision to not present the video or call Mease to testify should have created doubt in the jury's mind. Moody has failed to demonstrate that Swanson's performance was deficient due to his failure to present the video at trial.

In summary, Moody has failed to prove that Swanson's representation was ineffective in any manner. A thorough review of the trial transcript reveals that Swanson's performance was not less than that guaranteed by the Sixth Amendment and did not deprive Moody of a fair trial.

### III. Are Moody's Convictions for Conspiracy to Commit First-degree Murder and Conspiracy to Commit Aggravated Intimidation of a Witness Multiplicitous?

Next, Moody contends that his convictions for conspiracy to commit first-degree murder and conspiracy to commit aggravated intimidation of a witness are multiplicitous. Relying on *State v. Mincey*, 265 Kan. 257, 963 P.2d 403 (1998), Moody contends that a single continuing conspiracy cannot be broken into subagreements for the purpose of multiple prosecutions. Although the State conceded in its brief that Moody's convictions for conspiracy to commit first-degree murder and conspiracy to commit aggravated intimidation of a witness were multiplicitous, the State withdrew its concession during oral argument based on our Supreme Court's recent decision in *State v. Patten*, 280 Kan. 385, 122 P.3d 350 (2005). In that case, our Supreme Court adopted the use of a strict elements test in determining when charges in a complaint or an information are multiplicitous. The *Patten* court held that if each charge requires proof of an element not necessary to prove the other charge, the charges, even if they stem from a single act, are not multiplicitous. 280 Kan. 385, Syl. ¶ 3.

Whether convictions are multiplicitous is a question of law subject to unlimited review. *State v. Robbins*, 272 Kan. 158, 171, 32

P.3d 171 (2001). While Moody failed to raise the multiplicity issue at trial, a claim of multiplicity may be raised for the first time on appeal when necessary to serve the ends of justice and prevent a denial of fundamental rights. *State v. Groves*, 278 Kan. 302, 303-04, 95 P.3d 95 (2004).

"Multiplicity is the charging of a single offense in several counts of a complaint or information. The reason multiplicity must be considered is that it creates the potential for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and section 10 of the Kansas Constitution Bill of Rights." *Robbins*, 272 Kan. at 171.

Consequently, we will address Moody's multiplicity issue.

The State may not split a single offense into separate parts when there is a single wrongful act which does not furnish the basis for more than one criminal prosecution. Nevertheless, when the criminal conduct of the defendant supports convictions for more than one crime, K.S.A. 2005 Supp. 21-3107 provides statutory authority for multiple convictions even though the criminal conduct of a defendant consists of a single transaction. See *Mincey*, 265 Kan. at 262.

As stated earlier, Moody bases his multiplicity argument on *Mincey*. In that case, our Supreme Court reversed the defendant's conviction for conspiracy to commit aggravated robbery because it was multiplicitous with her conviction for conspiracy to commit first-degree murder. The *Mincey* court stated:

"A single continuing conspiracy, however diverse its objects, cannot be broken down into component sub-agreements for the purpose of multiple punishments or multiple prosecutions. When separate conspiracies are alleged and both are founded on a general conspiracy statute, the relevant inquiry is whether there existed more than one *agreement* to perform an illegal act or acts." 265 Kan. at 268.

Based on the evidence presented during Moody's trial, it was apparent that one agreement existed between Moody and the other conspirators to kill Pike to prevent him from testifying at Rodriguez' trial. This would seem to suggest that Moody's conspiracy convictions were multiplicitous under the test used in *Mincey*.

Nevertheless, in *Patten*, our Supreme Court held that a strict elements test should be used in determining when charges are

multiplicitous. Leading to its holding in *Patten* that the strict elements test should be adopted, our Supreme Court reviewed and discussed several of its prior decisions. Citing *State v. Schuette,* 273 Kan. 593, 600-01, 44 P.3d 459 (2002), the *Patten* court stated that two sources of multiplicity existed:

" ' "The concept of multiplicity in Kansas comes from two sources. The first is the traditional 'common-law' multiplicity concept. This exists where the State attempts to use a single wrongful act as the basis for multiple charges and is based on the merger of the charges. *State v. Garnes,* 229 Kan. 368, 372, 624 P.2d 448 (1981). This concept has been a part of Kansas law since at least our decision in *State v. Colgate,* 31 Kan. 511, 515, 3 Pac. 346 (1884), wherein we stated: '[U]pon general principles a single offense cannot be split into separate parts, and the supposed offender be prosecuted for each of such separate parts, although each part may of itself constitute a separate offense.' The test for whether the offenses merge and are, therefore, multiplicitous is whether each offense charged requires proof of a fact not required in proving the other; if so, then the offenses do not merge and are not multiplicitous. *Garnes,* 229 Kan. at 373. Offenses also do not merge if they are committed separately and severally at different times and at different places. 229 Kan. at 373."

" 'The second source, or layer, of the multiplicity analysis formerly came by statute in K.S.A. 21-3107(2)(d). K.S.A. 21-3107(2)(d) defined an included offense as "a crime necessarily proved if the crime charged were proved" and stated that a defendant could not be convicted of both the crime charged and the included offense. This statute was amended in 1998, and subsection (2)(d) was eliminated. L. 1998, ch. 185, sec. 1. It was replaced with language defining an included crime as "a crime where all elements of the lesser crime are identical to some of the elements of the crime charged." See K.S.A. 2001 Supp. 21-3107(2)(b). The present statutory language in essence mirrors the common-law elements test, thereby leaving it as the only remaining test for multiplicity. See also *State v. Saiz,* 269 Kan. 657, 662-63, 7 P.3d 1214 (2000) (for crimes committed after effective date of 1998 amendment of K.S.A. 21-3107, second prong of *State v. Fike,* 243 Kan. 365, 757 P.2d 724 [1988], disregarded).' 273 Kan. at 600-01." *Patten,* 280 Kan. at 388-89.

The *Patten* court further pointed out that from those two sources two tests had developed: (1) the "common-law" elements test and (2) the strict elements test.

Citing *Garnes,* 229 Kan. 368, and *Groves,* 278 Kan. 302, the *Patten* court stated that under the "common-law" elements test, the offenses did not merge and were not multiplicitous if each offense charged required proof of a fact not required in proving

the other. Turning to the strict elements test, the *Patten* court stated that the test was whether each offense required proof of an element not necessary to prove the other offense. If so, the charges stemming from a single act were not multiplicitous. 280 Kan. at 389. In questioning whether the two tests were the same, the *Patten* court noted that the "common-law" elements test focused on what facts were proved in satisfaction of the elements. On the other hand, the strict elements test focused on the elements of the offenses charged. 280 Kan. at 389.

Acknowledging that the court's previous decisions had reflected a mix of approaches, the *Patten* court pointed out that "[t]he approach used by the court in recent multiplicity cases [had] been determined based on the parties' arguments." 280 Kan. at 393. The *Patten* court noted that in the case before it, the State had urged the court to apply the strict elements test while Patten had advocated consideration of the facts that proved the elements. The *Patten* court determined that the strict elements test was more appropriate than the "common-law" elements test. 280 Kan. at 393.

The *Patten* court grounded its conclusion that the strict elements test should be adopted because it was logical, was easy to apply, and promoted certainty. By contrast, the *Patten* court stated that "[c]onsideration of the facts proved . . . puts multiplicity on a case-by-case basis." 280 Kan. at 393. Finally, the *Patten* court noted that by adopting the strict elements test, the court would "avoid any possibility of returning to the difficulties of the second prong of the *Fike* test." 280 Kan. at 393. As a result, in determining when charges in a complaint or an information are multiplicitous, the strict elements test must be used.

Now we turn out attention to the elements of the charges. The elements required for proof of conspiracy to commit first-degree murder and conspiracy to commit aggravated intimidation of a witness were detailed earlier. A review of the elements demonstrates that conspiring to act to prevent or dissuade an individual from testifying at a trial is not a required element of conspiracy to commit first-degree murder. Likewise, conspiring to attempt to intentionally kill an individual with premeditation is not an element of conspiracy to commit aggravated intimidation of a witness. See

K.S.A. 21-3302; K.S.A. 21-3401; K.S.A. 21-3833. Hence, application of the strict elements test shows that Moody's convictions are not multiplicitous. As a result, Moody's conviction for conspiracy to commit aggravated intimidation of a witness must stand.

## IV. Are Moody's Convictions for Attempted First-degree Murder and Aggravated Intimidation of a Witness Multiplicitous?

Finally, Moody contends that his convictions for attempted first-degree murder and aggravated intimidation of a witness are multiplicitous. Moody maintains that "the act of attempting to shoot and kill Eric Pike and the act of intimidating him into not testifying were one and the same." The State counters that the convictions are not multiplicitous because both offenses require proof of different facts.

Applying the *Patten* strict elements test, we determine that Moody's convictions are not multiplicitous. Acting in an attempt to prevent or dissuade an individual from testifying at a trial is not a required element of attempted first-degree murder. Likewise, an attempt to intentionally kill an individual with premeditation is not an element of aggravated intimidation of a witness. See K.S.A. 21-3401; K.S.A. 21-3833. As a result, Moody's argument fails.

Affirmed.

MALONE, J., concurring and dissenting: I concur with the majority's thorough analysis that Nicholas Moody's convictions were supported by sufficient evidence and that the trial court did not err in denying Moody's claim of ineffective assistance of counsel. However, I respectfully dissent from the majority's conclusion that Moody's separate conspiracy convictions were not multiplicitous. I also disagree with the majority's conclusion that Moody's convictions of attempted first-degree murder and aggravated intimidation of a witness were not multiplicitous.

"Multiplicity is the charging of a single offense in several counts of a complaint or information. The reason multiplicity must be considered is that it creates the potential for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and section 10 of the Kansas Constitution Bill of Rights." *State v. Robbins*, 272 Kan. 158, 171, 32 P.3d 171 (2001).

In *State v. Mincey*, 265 Kan. 257, 258-59, 963 P.2d 403 (1998), the defendant was convicted of both conspiracy to commit first-degree murder and conspiracy to commit aggravated robbery based upon an agreement with two coconspirators to rob and kill a female victim. In determining the separate conspiracy convictions were multiplicitous, the Kansas Supreme Court stated:

"A single continuing conspiracy, however diverse its objects, cannot be broken down into component sub-agreements for the purpose of multiple punishments or multiple prosecutions. When separate conspiracies are alleged and both are founded on a general conspiracy statute, the relevant inquiry is whether there existed more than one *agreement* to perform an illegal act or acts." 265 Kan. at 268.

Here, the majority acknowledges there was one agreement between Moody and the other conspirators to kill Eric Pike to prevent him from testifying at Isaac Rodriguez' trial. *Mincey* is directly on point and should compel the conclusion that Moody's separate conspiracy convictions were multiplicitous. However, the majority has determined that *Mincey* is no longer good law in light of the Kansas Supreme Court's subsequent decision in *State v. Patten*, 280 Kan. 385, 122 P.3d 350 (2005). In *Patten*, the court held the defendant's convictions of manufacture of methamphetamine and possession of drug paraphernalia with intent to manufacture methamphetamine were not multiplicitous. In reaching this conclusion, the court determined the only test for multiplicity is the strict elements test without considering the facts that must be proven to establish those elements. 280 Kan. at 393.

The majority notes the elements required to prove conspiracy to commit first-degree murder are different from the elements required to prove conspiracy to commit aggravated intimidation of a witness. Thus, in an attempt to apply the strict elements test to determine multiplicity, the majority concludes Moody's separate conspiracy convictions were not multiplicitous.

Even if the strict elements test is the only applicable test for determining multiplicity of criminal charges, the court's holding in *Mincey* is still good law and has not been modified by *Patten*. It does not matter that the elements of conspiracy to commit first-degree murder are not all the same as the elements of conspiracy

to commit aggravated intimidation of a witness. What matters is that there was only one agreement between Moody and the other conspirators to commit these crimes. *Mincey* teaches that when there is one agreement between conspirators to commit multiple crimes, the agreement cannot be broken down into separate conspiracy charges for each underlying offense. 265 Kan. at 268.

Under the majority's rationale, if coconspirators reach one agreement to commit five separate crimes, then each conspirator could be convicted of five separate conspiracy counts. This conclusion is contrary to the court's holding in *Mincey*. Moody's separate conspiracy convictions were multiplicitous. If a jury returns guilty verdicts to multiplicitous charges, the trial court must accept only the verdict as to the greater charge under the doctrine of merger. See *State v. Dixon*, 252 Kan. 39, 49, 843 P.2d 182 (1992). Accordingly, Moody's conviction of conspiracy to commit aggravated intimidation of a witness should be reversed.

I also disagree with the majority's conclusion that Moody's convictions of attempted first-degree murder and aggravated intimidation of a witness were not multiplicitous. Under the facts of this case, I would conclude the convictions were multiplicitous because the same wrongful act provided the basis for each offense.

Kansas courts have long recognized that separate offenses are multiplicitous when the defendant's same wrongful act provides the basis for each offense, even though different elements are necessary to prove each charge. In *State v. Vontress*, 266 Kan. 248, 970 P.2d 42 (1998), the defendant shot the victim in the course of a robbery and was convicted of separate counts of aggravated robbery and aggravated battery. On appeal, the defendant asserted the convictions were multiplicitous. In arguing the convictions were not multiplicitous, the State pointed out that aggravated battery required proof of elements not necessary to prove aggravated robbery, and vice versa. Thus, according to the State, the convictions were not multiplicitous under the elements test. The court rejected this argument and stated:

"The State fails to acknowledge that the sole allegation of bodily harm in its complaint and the judge's instructions to the jury was Spires' [the victim] gunshot wounds. To prove the bodily harm element of aggravated robbery, the State was

required to prove one fact: Vontress shot Spires—the same fact necessary for proof of the great bodily harm element of aggravated battery. Under the information and instructions in this case, the aggravated battery count required proof of the fact which was also required to prove the aggravated robbery charge. Therefore, the convictions are multiplicitous, and the punishment for both crimes is a violation of double jeopardy. The aggravated battery conviction is reversed." 266 Kan. at 257.

See also *State v. Groves*, 278 Kan. 302, 307-08, 95 P.3d 95 (2004) (defendant's convictions of aggravated battery and aggravated robbery were multiplicitous under the facts); *State v. Warren*, 252 Kan. 169, 182, 843 P.2d 224 (1992) (defendant's convictions of aggravated battery and aggravated robbery were multiplicitous when based on the same act of knocking the victim to the ground and taking her purse).

Here, Moody was convicted for aiding and abetting Travis Kohn who attempted to kill Pike by firing a gun at his head, but the gun misfired. Kohn was attempting to kill Pike to prevent him from testifying at Rodriguez' trial. To prove the crime of attempted first-degree murder, the State was required to prove one fact: Kohn attempted to kill Pike by firing a gun at his head. To prove the crime of aggravated intimidation of a witness, the State was required to prove one fact: Kohn attempted to kill Pike to prevent him from testifying at Rodriguez' trial. Kohn intimidated Pike from testifying by attempting to kill him. The State concedes that the same wrongful act provides the basis for both convictions. Based upon the rationale of *Vontress*, Moody's convictions of attempted first-degree murder and aggravated intimidation of a witness were multiplicitous.

*Warren, Vontress,* and *Groves* have not been overruled. Whether two separate offenses are multiplicitous must be determined by the circumstances of each case. The facts matter and must be considered. If a single wrongful act by the defendant provides the basis for more than one charge, then the offenses are multiplicitous and the defendant must not receive multiple punishments for the same act.

As it stands, Moody has been punished twice for the attempt to kill Pike. He was punished by the sentence he received for his

conviction of attempted first-degree murder. He was also punished by the sentence he received for his conviction of aggravated intimidation of a witness. This is precisely what the doctrine of multiplicity is designed to prevent.

The majority is correct in noting that the elements of attempted first-degree murder are different from the elements of aggravated intimidation of a witness. Under the strict elements test enunciated in *Patten*, attempted first-degree murder and aggravated intimidation of a witness are not multiplicitous crimes. Then again, it is difficult to discern how any two crimes are multiplicitous under a strict elements test, since no two crimes have virtually the same elements. In any event, the present case can be distinguished from *Patten*, a drug case which did not address the single act of violence rule of multiplicity. The holding of *Patten* should be limited to its facts and does not undermine the many prior decisions recognizing the merger of crimes when they arise from the same wrongful act committed by the defendant.

Finally, there is no need to adopt the strict elements test as the only test for multiplicity in order "to avoid any possibility of returning to the difficulties of the second prong of the *Fike* test." *Patten*, 280 Kan. at 393; see *State v. Fike*, 243 Kan. 365, Syl. ¶ 1, 757 P.2d 724 (1988) (a crime may be a lesser included offense of the crime charged if the evidence required to prove the crime charged necessarily proves the lesser crime). The "second prong of the *Fike* test" was only applicable in determining lesser included offenses, and this test has now been eliminated based upon 1998 amendments made to K.S.A. 2005 Supp. 21-3107(2). See L. 1998, ch. 185, sec. 1; *State v. Saiz*, 269 Kan. 657, 661-63, 7 P.3d 1214 (2000). However, this was never a proper test for determining multiplicity. The fact that Kansas appellate courts have traditionally addressed the issue of multiplicity interchangeably with the issue of lesser included offenses has contributed to the confusion. See *Mincey*, 265 Kan. at 261; *Warren*, 252 Kan. at 175. The doctrine of multiplicity, which prohibits multiple punishments for a single offense, is derived from the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. The test for multiplicity is not,

and never has been, governed by the language of K.S.A. 2005 Supp. 21-3107(2).

Under the facts of this case, Moody's convictions of attempted first-degree murder and aggravated intimidation of a witness were multiplicitous. Both convictions were based upon the same wrongful act. Accordingly, Moody's conviction of aggravated intimidation of a witness should be reversed.