No. 48,139

State of Kansas, *Appellee,* v. Hal H. Daugherty, *Appellant.*

(562 P. 2d 42)

Opinion filed March 5, 1977.

*Russell Shultz,* of Wichita, argued the cause and was on the brief for the appellant.

*Stephen M. Joseph,* Assistant District Attorney, argued the cause, and *Curt T. Schneider,* Attorney General, and *Keith Sanborn,* District Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: Defendant-appellant, Hal H. Daugherty, appeals from a conviction of conspiracy to commit arson in violation of K. S. A. 21-3718 and 21-3302.

Defendant was charged in two counts of a seven count information which lodged charges against defendant Gerald L. Ray (sometimes referred to as Jerry Ray), Tommie Gene Padgett, Robert Leon Rowlett and Willard L. Gettle, Jr. All of the offenses were alleged to be connected with proposals to burn three buildings owned by Willard L. Gettle, Jr.

Willard L. Gettle, Jr., a Wichita businessman who owned and operated a business known as Wichita Beef, Incorporated, located at 2952 North Arkansas Street in Wichita, was the central figure in all of the events giving rise to the charges filed. Gettle also owned a building located at 400 North Hydraulic in Wichita and another building in Augusta, which were involved in the conspiracy charges.

The investigation covered the activities of Gettle, the four defendants charged and other parties connected with the schemes through the years 1971, 1972 and 1973. As a result of the investigation a seven count information was filed. Counts One, Five and Seven related to the 1971 burning of Gettle's building at 2952 North Arkansas. Count One charged Ray with arson. Count Five charged Ray and Daugherty with conspiracy to commit arson. Count Seven charged Ray with making terroristic threats against Gettle.

Counts Two, Three and Four related to the 1973 conspiracy to burn Gettle's building at 400 Hydraulic. Count Two charged Ray and Padgett with criminal use of explosives in transporting and possessing the turpentine they were going to use to burn the building. Count Three charged Ray and Padgett with possession of burglary tools and possession of the key to the building. Count Four charged Ray and Padgett with attempted arson of the building.

Count Six related to the 1973 conspiracy to burn Gettle's building in Augusta. Daugherty and Rowlett were charged in this count with conspiracy to commit arson.

The then attorney general (Vern Miller) became involved in the investigation in its early stages and thereafter directed the activities of the law enforcement officials involved. Miller granted immunity to Gettle. Soon after the trial began, Ray, as a result of plea negotiations, entered a plea of guilty and became a witness for the state. At trial, Padgett and Rowlett were acquitted as a result of their defense of entrapment. Defendant Daugherty was acquitted on the 1973 conspiracy charge (Count Six), but was convicted on the 1971 conspiracy charge relating to the 1971 burning of Gettle's building at 2952 North Arkansas in Wichita (Count Five).

The prosecution evidence, as in most conspiracy cases, is lengthy and complex. The state's case was generally structured around the testimony of Gettle and Ray and several law enforcement officers involved in the investigation.

The testimony of Gettle and Ray, pertinent to the points on appeal, commences with Gettle's testimony concerning a conversation with defendant which took place at either Gracie's Cafe or the Red Garter Lounge in Wichita during June 1971. Gettle testified that during this conversation the subject of fires in the Wichita area was brought up. Defendant told Gettle that several of these fires were "set fires," meaning arson. Gettle testified he told the defendant he was unhappy with the meat business, that he would like to get out of it; and the possibility of burning the business down was brought up. Defendant told Gettle he thought he could put him in touch with someone who could burn a building down. Defendant said the man's name was Jerry Ray.

Ray testified that in June 1971 Daugherty contacted him and asked if he would come to Wichita to meet a man who wanted some work done. Without further explanation Ray agreed to come.

Gettle further testified that he went to the Red Garter Lounge on numerous occasions following his conversation with defendant concerning the fires. On one such visit, approximately two weeks later, defendant introduced him to Jerry Ray. Ray testified that defendant called Gettle outside, introduced the two men to one another and then said, "This is the gentleman I wanted you to meet that I called you about. You all go somewhere and talk." Defendant then went away, leaving Ray and Gettle together to talk in private.

During the conversation Ray told Gettle he could put him in touch with someone who could burn Gettle's building and that he would call Gettle at a later date. Ray testified that after Gettle left

he went back into the club and inquired of defendant: "This man is talking about a fire. Do you think I could trust him?" Daugherty replied, "Yes, you can trust him."

In late June or early July 1971, Ray introduced Gettle to Tom Padgett at the Wichita airport. Padgett quoted a price of $20,-000.00 for doing the arson job, told Gettle to consider it and let either Ray or him know what he finally decided.

Gettle testified he met with Ray a few days later and told him he was no longer interested in having the building burned. On this point the testimony of the two principal prosecution witnesses, Gettle and Ray, is in conflict. Regarding this same meeting, Ray testified Gettle did not say he did not want to go through with the plan. Ray further testified he subsequently received a call from Gettle and Gettle told him the people with whom he had been put in touch with "wanted too much to burn the building."

In any event, Ray subsequently introduced Gettle to two men named Guy and James and told Gettle they could do the job for him. Gettle testified the men offered to do the job for less money and when he still refused to go through with it, they told him he was in too deep to get out—

". . . [I]f I did not go through with it, and I can't tell which one said it, either Guy or James, in fact they acted almost proud of it, that I could be dropped at a quarter of a mile away . . . I assumed that this meant I could be shot at a quarter of a mile away."

Ray confirmed that such a threat was made to Gettle by James, who warned Gettle "to stay cool about it. . . ."

Gettle testified the men told him they were going to go ahead with the job and that he would comply with their wishes. They demanded $1,500.00 in advance and a total amount of either $6,000.00 or $8,000.00. For his services Ray was supposed to receive five portable advertising signs from Gettle. Gettle paid the $1,500.00 to Ray and the four of them parted company, agreeing to meet again on July 20 at a Wichita motel. In the meantime, Gettle had his attorney raise the insurance coverage on the building by $30,000.00.

During the night of July 20-21, 1971, the building at 2952 North Arkansas was burned by Ray, James, Guy, Gettle and another unidentified man. After the fire was extinguished, Wichita Fire Inspector Robert Langley entered the building and discovered

several turpentine-soaked cloth "trailers" or strips running throughout the building.

Within two or three days after the fire, Gettle told the defendant he was under a lot of pressure from the police and fire departments about the fire. Daugherty told him to "keep calm, keep cool, that was all Gettle could do."

Attorney General Miller testified that after he became involved in the investigation he received numerous telephone calls from Gettle in February 1973, but did not return them because he did not want to talk to him at that time. In the latter part of February 1973, the attorney general talked to Gettle's attorney, Ray Hodge. As a result of this conversation, the attorney general came to Wichita where he met with Hodge and Gettle on March 2, 1973.

At this meeting the attorney general told Gettle he was aware of the fire at 2952 North Arkansas and mentioned Ray's name to him. The attorney general then said: "Gettle, I'm in the position to give you immunity if you tell me the whole truth about this matter." Gettle agreed to cooperate and told the attorney general about the circumstances leading up to the fire. They agreed to meet again on March 7. The attorney general admonished Gettle not to make contact with anyone until he heard from him.

Despite this admonition, on March 6, 1973, Gettle called Ray from his home and recorded the conversation. The tape recording of this conversation was introduced at trial as State's Exhibit 17. Ray testified that prior to this call Daugherty had called him in San Antonio, Texas, and told him Bud Gettle was trying to get in touch with him. After the call from Gettle, on March 6, which was taped, Ray testified he got in touch with Padgett and asked him if he wanted to go to Wichita to make some money by burning a building. Padgett agreed to go and the two of them drove to Wichita a few days later.

The tape of the March 6 conversation between Gettle and Ray was played for the attorney general during a meeting on March 7, in Ray Hodge's law office. After listening to the tape recording the attorney general commented that it appeared Ray was still "in business" and he wondered if Daugherty might still be the contact man. Gettle indicated he thought Daugherty was still the contact man. The attorney general granted full immunity from prosecution to Gettle and stated: "Let's call Hal now and we'll tape it. I want to hear what he has to say." Gettle called the defendant

from Hodge's office and the tape recording of this call was admitted at trial as State's Exhibit 18. The taped conversation disclosed that Daugherty was still a contact man, as indicated by Gettle. Gettle indicated to Daugherty that he needed to get someone for another arson job and first inquired about Jerry Ray. Daugherty said that Ray had moved and might not be available and suggested that Leon Rowlett could do the job. After some conversation in which Daugherty assured Gettle that Rowlett could do the job, Daugherty told Gettle that he would contact Rowlett and arrange a meeting of the three of them and line things up.

After the March 7, 1973, meeting in Mr. Hodge's office, Attorney General Miller assigned Dave Wood, an agent of the Kansas Bureau of Investigation, to work with Gettle as an undercover agent. Gettle introduced Wood as his cousin to the defendant. Defendant told Gettle that Leon Rowlett could be trusted to handle the burning of a building. Defendant then introduced Wood and Gettle to Leon Rowlett. Gettle and Rowlett discussed the burning of Gettle's building in Augusta. Rowlett told Gettle he could handle the job or, if not, at least find someone who could. Gettle, Wood and Rowlett met the following day and inspected the building in Augusta. Gettle then told Rowlett that Dave Wood would handle the matter from that point on.

On March 13, 1973, Ray and Padgett arrived in Wichita about 1:00 p. m. Ray met Wood at a prearranged place and time, believing at the time he was dealing with Gettle's cousin. Wood gave Ray a key to the building and Ray left to get Padgett. Ray drove Padgett to the building at 400 North Hydraulic and gave him the key so he could inspect the premises. Shortly thereafter he returned and picked up Padgett. The two men had a duplicate key made and Ray returned alone to see Wood and agreed to burn the building for $6,000.00, half in advance and the rest on the night after the fire. Wood paid Ray $3,000.00 in cash. Ray and Padgett then left Wichita. While Ray and Padgett were in the vicinity of the 400 North Hydraulic building they were being watched by Attorney General Miller and other law enforcement officers.

On March 14, 1973, Gettle called Ray and told him the fire had to be on March 15 since Gettle was going to be out of town on that date. On March 15 Ray and Padgett arrived in Wichita about 6:30 p. m. They were both arrested after they had carried two

cans of inflammable liquid into the building located at 400 North Hydraulic. At approximately the same time Rowlett and another man were arrested in front of the building in Augusta. They were found to be in possession of three bottles of inflammable liquid.

The record reflects that in response to a telephone call from Gettle, Miller met with Gettle and defendant at a Wichita restaurant on March 16, 1973. Miller told defendant that he was in trouble concerning the fire at 2925 North Arkansas and that possibly charges would be brought against him. Defendant denied having any knowledge about the arsons.

A few days before trial, Jerry Ray received word from defendant that he wanted to talk to him. Ray was in the process of plea negotiations at the time. Two days before trial, Ray telephoned defendant and arranged to meet him in Ray's motel room in Wichita. Ray testified he believed his room was bugged and that two KBI agents were in an adjoining room. At this meeting Ray told Daugherty he was concerned about a check Daugherty had given him in connection with another arson conspiracy. Daugherty told Ray he had nothing to worry about because the check was made out to Ron Wormuth, an employee of Ray, and that Daugherty had gone to his files and pulled the original check out. This testimony was elicited after the jury had been excused from the courtroom for a hearing on its admissibility. (*State v. Bly*, 215 Kan. 168, 523 P. 2d 397.)

A photocopy of Daugherty's check, payable to Wormuth, was located after extensive searches of defendant's bank files and was admitted as evidence of another crime under K. S. A. 60-455. A "shotgun" type instruction was given limiting the jury's consideration of this evidence to all eight elements listed in 60-455. Further circumstances in connection with the admission of this check into evidence will be discussed in connection with one of defendant's points on appeal.

Defendant specifies thirteen points of error on appeal, but briefs only six of them. As his first point defendant asserts the trial court erred in refusing to separate the defendants for trial. The record fails to reveal the filing by defendant of any motion to sever. Neither does the record reflect any objection by defendant to a joint trial in any of the pretrial proceedings. Defendant makes no attempt in his brief to show cause for not raising the claim of misjoinder before trial. Thus, defendant's failure to move for severance before trial constitutes a waiver of any objection to joinder.

Moreover, the granting of a separate trial under K. S. A. 22-3204 is discretionary with the court and no abuse of discretion is shown by the joinder under the facts and circumstances herein. (*State v. Sully,* 219 Kan. 222, 547 P. 2d 344; and *State v. Williams & Reynolds,* 217 Kan. 400, 536 P. 2d 1395.)

In his second point defendant claims error in the denial of his motions for judgment of acquittal lodged at the close of the state's evidence and again at the close of all the evidence. The question presented is whether the state's evidence is sufficient to show that defendant's conduct falls within the proscription of our conspiracy statute K. S. A. 21-3302, which reads in pertinent part:

"(1) A conspiracy is an agreement with another person to commit a crime or to assist to commit a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by him or by a co-conspirator.

"(2) It shall be a defense to a charge of conspiracy that the accused voluntarily and in good faith withdrew from the conspiracy, and communicated the fact of such withdrawal to one or more of his co-conspirators, before an overt act in furtherance of the conspiracy has been committed by him or by a co-conspirator."

As may be seen, the crime of conspiracy as defined by the statute consists of two essential elements: (1) An agreement between two or more persons to commit or to assist in committing a crime and (2) an overt act in furtherance of the conspiracy committed by one or more of the conspirators.

In upholding the statute against constitutional challenge in *State v. Campbell,* 217 Kan. 756, 539 P. 2d 329, cert. den. 423 U. S. 1017, 46 L. Ed. 2d 389, 96 S. Ct. 453, we had this to say concerning the offense defined therein:

"K. S. A. 21-3302 provides that a conspiracy is an agreement with another person to commit a crime or to assist to commit a crime. The essence is the *agreement to commit a crime,* not simply to commit a particular act, as to drive an automobile at a certain time and place. Clearly a mental state is contemplated. . . ." (p. 770).

A motion for judgment of acquittal is provided for by K. S. A. 22-3419(1). The test to be applied in ruling on such motion was announced by this court in *State v. Gustin,* 212 Kan. 475, 510 P. 2d 1290, wherein we held:

"A trial judge in passing upon a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes guilt beyond a reasonable doubt is a fairly possible result, he must deny the motion and let the jury decide the matter. If he

concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion." (Syl. 3.)

Defendant first argues he "virtually withdrew from the conspiracy when he refused to participate in the conspiracy initially between Gettle and Ray." The trouble with this argument is that the testimony of Gettle and Ray on the point, as we have previously pointed out, was in conflict. Whether Gettle and defendant abandoned the conspiracy or whether Gettle withdrew from it thus presents a question of fact for the jury. (*People v. Rosen*, 18 Mich. App. 457, 171 N. W. 2d 488.) Viewing the conflicting evidence in the light most favorable to the prevailing party below, as we are required to do (*State v. Beard*, 220 Kan. 580, 552 P. 2d 900), we are unable to say the jury was wrong in concluding the defendant did not withdraw from the conspiracy.

Defendant further argues there is no evidence to show that he had a "stake" in the outcome of the conspiracy. It has been held that to be a co-conspirator one need not have a financial stake in the success of the conspiracy. In this regard all that is required on the part of a co-conspirator is that he not be indifferent to its outcome. (*United States v. Noah*, 475 F. 2d 688 [9th Cir. 1973], cert. den. 414 U. S. 1095, 38 L. Ed. 2d 553, 94 S. Ct. 728.)

From the evidence we have recited it may fairly be concluded, not only that defendant was not indifferent to, but that he was intensely interested in the outcome of the conspiracy to burn the building at 2952 North Arkansas for which he stands convicted. Defendant and Gettle initially conceived the conspiracy and defendant continued to participate as the contact or "go-between" in arranging the meetings and introductions which finally resulted in the arson.

Defendant cites only the case of *United States v. Falcone*, 311 U. S. 205, 85 L. Ed. 128, 61 S. Ct. 204, in support of his arguments relating to the denial of his motions for acquittal.

Defendant's reliance on *Falcone* is misplaced. Falcone and other accused were charged with conspiracy to violate revenue laws by the operation of illicit stills in the vicinity of Utica, New York. The accused knew that the materials which they sold would be used by others in illicit distilling, but the evidence was insufficient to show that they knew of the conspiracy among the distillers. The question before the court was put in these words by Mr. Justice Stone:

"The question presented by this record is whether one who sells materials with knowledge that they are intended for use or will be used in the production of illicit distilled spirits may be convicted as a co-conspirator with a

distiller who conspired with others to distill the spirits in violation of the revenue laws." (p. 206.)

Falcone and the other respondents were jobbers and distributors who sold sugar and yeast. The thrust of the *Falcone* decision is simply that those who have no knowledge of a conspiracy are not conspirators and that one merely furnishing supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of the conspiracy to which the distiller was a party but of which the supplier had no knowledge.

In the case at bar, defendant was not merely a supplier of goods to be used for an illegal purpose. He was an active participant in and had full knowledge of the conspiracy. His function was to procure and introduce an arsonist to the conspiracy. He did so and at that point the crime of conspiracy was committed even though subsequent overt acts, including the arson, were later committed and additional co-conspirators were joined with the original conspiracy.

In the case at bar, the evidence discloses that defendant agreed to assist Gettle in committing the crime of arson; that defendant subsequently asked Ray to come to Wichita and meet Gettle; and that defendant introduced the two and assured Gettle that Ray could handle the job and told Ray that Gettle could be trusted. Defendant's introduction of Ray to Gettle was with knowledge of its purpose, and as such constituted both adherence to the conspiracy and an overt act toward its accomplishment. (*United States v. Barone*, 458 F. 2d 1027 [3rd Cir. 1972].)

We believe the record discloses sufficient competent evidence to support the trial court's rulings on defendant's motions for judgment of acquittal under the test to be applied.

Defendant's sixth point concerns the "bugged" conversation between Ray and defendant in Ray's motel room two days before the trial. As a result of this conversation the state learned from defendant's statements to Ray of a check which defendant, apparently, had made in connection with a previous and unrelated arson conspiracy involving defendant and Ray. After a search of defendant's bank records, a photocopy of the check was secured. After a *State v. Bly*, supra, hearing the check was admitted as evidence of a previous similar crime under K. S. A. 60-455. Defendant specifies error in these words:

"That the co-defendant, Gerald Ray, in cooperation with the state, the day before the jury trial started, met with this defendant, Hal Daugherty, in a

motel room that was bugged by the state and induced him to make certain statements which were on tapes, all of said action being in agreement with the attorney general of the State of Kansas, and with the District Attorney of Sedgwick County, Kansas, knowing very well that the defendant, Hal Daugherty, was represented by T. L. O'Hara, an attorney of Wichita, Sedgwick County, Kansas, and Bruce B. Fitts of Wichita, Sedgwick County, Kansas."

The check obtained from defendant's bank records following the conversation intercepted by electronic surveillance, we believe constitutes "fruit" of an interrogation conducted in contravention of the Sixth Amendment right to counsel, as defined in *Massiah v. United States,* 377 U. S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199, and followed by this court in *State v. McCorgary,* 218 Kan. 358, 543 P. 2d 952.

The petitioner in *Massiah* had been indicted for a federal narcotic violation. He had retained counsel, pled not guilty, and was out on bail. A few days later, and without Massiah's knowledge, an alleged confederate decided to cooperate with government agents in their investigation. This confederate permitted the agents to install a radio transmitter in his automobile by means of which the agents were able to listen to a conversation in which the confederate engaged Massiah. Evidence of several incriminating statements made by Massiah during this conversation was allowed into evidence over objection at the trial. Reversing the conviction, the United States Supreme Court stated:

". . . We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. . . ." (p. 206.)

In this appeal the state concedes if this meeting occurred at a time when Ray was an "agent" of the state, then the conviction is suspect under *Massiah* and *McCorgary.* However, since Ray did not plead guilty and agree to cooperate as a witness until the first day of trial, the state argues in its brief there is insufficient evidence of such agency to support the contention urged by the defendant. Ray's testimony, we believe, clearly shows, that as an aid to his plea negotiations, with which he was involved at the time, he was acting as an informer and an agent of the state.

In discussing the *Massiah* holding in our opinion in *McCorgary* we pointed out that the *Massiah* exclusionary rule does not apply to voluntary statements of a defendant which are made to private

citizens. But, as applicable to the issue at bar, we proceeded to say:

". . . It is only when the state actively engages in prior arrangements with an informer to obtain desired information in contravention of constitutionally protected rights that the sanction of suppression of the evidence is applied. The surreptitious arrangement which undercuts the right to counsel by the use of a secret informer is the evil sought to be removed. A police officer seeking information under similar circumstances would be required to inform the accused of his right to counsel and not proceed further until the accused knowingly and voluntarily waived such right. The whole purpose of the state in using a secret informer is to avoid that which is required of a police officer. What the state may not do directly to secure evidence, it cannot do indirectly. Such unfair tactics, if permitted, would override the individual's constitutionally based rights. [citing cases.]" (p. 363.)

Ray's testimony at trial indicates that prior arrangements had been made in the case at bar. When Ray was asked whether the KBI agents had asked him for permission to bug the motel room, he responded:

"A. In part of my plea negotiations that I talked about, we discussed the bugging of a room, if I could firm up my statement to them to be true, what I have told about. As far as asking me if they could bug the room, I had no objections to it, no.
"Q. Now, this was what, two days before the trial started?
"A. Yes, sir.
"Q. Did your attorney know about this?
"A. Yes, sir.
"Q. And they asked his permission?
"A. You'd have to ask my attorney. I don't know.
"Q. As far as you know, they didn't?
"A. As far as I know, did they ask his permission? I'm sure that they did or he would have told me otherwise."

Ray testified he believed the room was bugged and that two agents of the KBI were next door, but he did not see the bug. He further stated he saw the prosecutor, Mr. Hall, at the motel later that evening.

In addition to a discrepancy in Ray's recollection as to the year in which the check was issued, it was shown that Ray could not remember to whom the check was made payable. After defendant advised Ray during the taped conversation that the check was made out to Ron Wormuth, the state's investigators were able to obtain a photocopy of the check. Under these circumstances *McCorgary* renders this evidence inadmissible.

In connection with this point, the state further contends defendant failed to lodge a proper objection which would preserve

the question for appellate review. The only objections interposed by counsel for the defendant to the admission of the check and the accompanying oral testimony were that the evidence was beyond the scope of direct examination and that it was not the best evidence. Under these circumstances the state argues defendant has failed to satisfy the specificity requirement of K. S. A. 60-404, our contemporaneous objection rule, and this omission precludes appellate review of the contention.

Following oral argument in this case, we received a letter from Stephen M. Joseph, counsel for the state, concerning the electronic eavesdropping contention raised by the defendant. In his letter Mr. Joseph states, with commendable candor, that when he filed the state's brief and argued the cause before this court, he was not aware that the alleged electronic eavesdropping and surreptitious surveillance had occurred. In his letter counsel candidly states, "I know now that it did occur."

Mr. Joseph assures us in his letter there was no attempt by any state agent or representative to conceal the eavesdropping. However, from our own review of the record in this case, we believe the facts surrounding this incident were not developed to such an extent as to fully apprise defendant's trial counsel of the precise grounds upon which he should base an objection. Under these circumstances we are unwilling to apply the contemporaneous objection rule as a bar to our consideration of this matter. Neither are we able to declare this erroneous admission of evidence "harmless" in a case as closely contested as the one at bar. Under such circumstances, defendant must be granted a new trial.

In view of our disposition of the foregoing contention we need not consider other points argued on appeal. The judgment is reversed and the cause is remanded for a new trial.

SCHROEDER, J., dissenting.