IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,146

STATE OF KANSAS,
*Appellee,*

v.

DYRON M. KING,
*Appellant.*

SYLLABUS BY THE COURT

1.

When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.

2.

Conspiracy requires, in part, an agreement between two or more persons to commit or assist in committing a crime. The existence of an agreement can be proved by sufficient circumstantial evidence.

3.

Appellate courts use a two-step process to evaluate claims of prosecutorial error—simply described as error and prejudice. To determine if the prosecutor erred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair

1

trial. If the court finds error, the burden falls on the State to demonstrate beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility the error contributed to the verdict.

4.

A court may order a separate trial for any one defendant when two or more defendants are jointly charged with a crime. But either a defendant or the prosecuting attorney must first request the severance. A defendant's failure to request severance constitutes a waiver of his or her ability to seek severance.

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed June 1, 2018. Affirmed.

*Michael G. Highland*, of Bonner Springs, argued the cause and was on the brief for appellant.

*Ethan Zipf-Sigler*, assistant district attorney, argued the cause, and *Mark A. Dupree*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Following a string of violent robberies that occurred in Kansas City, Missouri, and Kansas City, Kansas, Dyron M. King and Cecil Meggerson were jointly tried. The jury convicted King of one count of attempted capital murder; three counts of aggravated robbery; two counts of aggravated battery; one count of conspiracy to commit aggravated robbery; and two counts of criminal possession of a firearm. The jury acquitted King of one count of aggravated robbery and one count of criminal threat. The district court imposed a hard 25 life sentence for the attempted capital murder and consecutive 449 months' imprisonment for the remaining convictions.

2

King appealed his convictions to this court, arguing (1) there was insufficient evidence that he was one of the robbers; (2) the prosecutor committed reversible error in closing arguments; (3) the district court erred by denying his motion for new trial; and (4) cumulative error deprived him of a fair trial. Because we find substantial evidence supports the jury verdict and we discern no reversible error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Given the nature of King's challenges on appeal, we will undertake a detailed recitation of the events leading to King's convictions.

*Don's Market and Liquors robbery*

On the evening of February 27, 2015, three men wearing black clothing and brandishing guns entered Don's Market and Liquors at 3000 Southwest Boulevard, Kansas City, Missouri. The cashier noticed one of the men was armed with a revolver and another carried a semiautomatic handgun with "a longer magazine." The man with the revolver—wearing a white mask and a pair of black and white gloves—came around the counter and demanded money. The cashier emptied the cash from the register into a plastic sack. The robbers then demanded the cashier's wallet, but when he was unable to locate it, he was pushed to the ground. The robbers left with the plastic sack, various types of liquor, cartons of cigarettes, and lottery tickets.

The store's surveillance cameras showed the man with the white mask was also wearing black and white batting gloves and gray "boot style" shoes. Another robber was carrying a "MAC-11 style" semiautomatic gun with an extended magazine. This suspect wore a mask and Nike shoes with a distinctive yellow or white toe pattern. The third robber was wearing all black and carrying a revolver with a wood handle. Surveillance

3

video from a nearby business showed the three suspects exit the store and get in a black four-door sedan with no front license plate.

*Family Dollar robbery*

Around 8:45 p.m. on March 3, 2015, Patricia Pope was working as a cashier at the Family Dollar located at 1225 Quindaro, Kansas City, Kansas. Reginald Jones was a customer in the store at the time. Pope was restocking the shelves when she noticed Jones make his way to the front register to pay for his items. As she walked to the front to help Jones, a taller man with a handgun came through the front door wearing black clothing, a mask, and gloves. The suspect approached Jones and pointed the gun at him. While this was occurring, two other individuals who were wearing dark clothing entered the store.

The taller suspect spoke to Jones, but Pope could not make out what was said. He then struck Jones in the forehead with the handgun, and Jones fell to the ground, bleeding heavily. While on the ground, Jones was told to give up his keys and billfold. Jones tossed them his keys and said to take his car. But the robbers eventually left the store without taking the keys.

After striking Jones, the taller suspect grabbed Pope and pushed her toward the counter. Once behind the counter, the man used a tool to pry open the cash register. He emptied the contents of the drawer into a store trash can and then repeated the same process at another cash register.

While the taller man was prying open the drawers, another robber shoved Pope to the ground near the store's safe, demanding she open it. When Pope said she could not open it, the man fired two shots near her, one hitting the ground by her leg. Pope repeated that she was unable to open the safe, so he fired a third shot over her shoulder next to her

4

face. The robbers left the store with the contents of the cash registers and some Newport cigarettes from behind the counter.

Pope noticed the taller suspect had on blue "workman's boots or workman's shoes." Pope told a responding officer she could tell all three suspects were black males, but she later testified at trial that she could not discern their race. The store's surveillance video revealed one of the men was wearing a hoodie with a large gold eagle on the back. Another suspect wore black and white gloves and had a MAC-style semiautomatic handgun with an extended magazine. All three suspects had a firearm, one of which was a revolver with a wood handle. In addition to the surveillance video, investigators recovered two shell casings and a bullet from the store.

*Shamrock robbery*

Shortly after 10 p.m. on March 3, 2015, three armed men dressed in black robbed a Shamrock gas station at 8505 Woodland Avenue in Kansas City, Missouri. Brenden Foxworthy and Dustin Paquet were working the evening shift. Both Foxworthy and Paquet described one of the robbers as taller than the others. The taller robber, who was wearing a black mask covering his entire face, ordered Foxworthy to open the registers and safe. Foxworthy opened the registers, but when he was unable to open the safe, he was struck several times on top of his head with a gun. Foxworthy fell to the ground where he remained until the suspects left.

Paquet observed one of the suspects was carrying a handgun with an extended magazine. All three robbers concealed their faces with either a mask, scarf, or hoodie. At some point before Foxworthy was struck, a shot was fired. After the suspects had left the store, Foxworthy heard shots being fired in the parking lot.

5

Surveillance footage showed the tallest robber was wearing all black clothing and wielding a semiautomatic handgun with an extended magazine. He was wearing black and white batting gloves and a gray boot style shoe. The second suspect was dressed in all black and wore a mask with a University of Missouri Tiger's logo. He had on two-tone gray gloves and was carrying a revolver with a wood handle. The last suspect wore a black hoodie with a distinctive gold eagle design on the back and a pair of gloves with a faded yellow logo. He also wore Nike shoes with a unique yellow and white toe pattern.

Foxworthy and Paquet told officers that the suspects took money and bottles of Patron. Video surveillance showed the robbers also took bottles of Rémy Martin, 1800 Tequila, and other bottles of tequila. Officers recovered several bullet shell casings from the parking lot.

*Kicks 66 robbery*

Around 12:45 a.m. on March 4, 2015, three masked men robbed a Kicks 66 gas station at the corner of 79th Street and Wornall Road in Kansas City, Missouri. Dannella Villa, the general manager, was training Derrick Brining that night. Villa saw three armed men dressed in dark clothing with their faces covered run through the front door. All three men were armed with handguns. Villa noticed one of the men had a mask with some sort of design. She described the height of the robbers as "one tall, one medium, and one short."

When they entered the store, Villa and Brining dropped to the ground, and Villa pressed the store's panic button. The tallest suspect and the medium-height suspect approached Villa and demanded money. One of the men came around the counter, and the other jumped over while firing gunshots. After opening one of the cash registers, Villa tried to open another but struggled to do so. The medium-height suspect used his pistol to hit her twice on the top of her head and once on her face. While striking Villa, he

6

said, "I'm gonna kill you, bitch." Villa fell to the ground, acting as though she was unconscious.

While they were behind the counter, the robbers tried to intimidate Villa and Brining by firing several shots near them. The robbers also tried to get Brining to open the safe, but because it was his first night on the job, he did not know how. Brining was struck several times with the butt of a gun. The robbers fired gunshots at the safe, trying to open it, and one of the bullets ricocheted off of the safe and struck Brining in the knuckle. They eventually abandoned their attempt to shoot open the safe, opting to ransack the store before leaving with the money from the registers.

Villa saw enough of the tall and medium robbers' skin to discern they were black. The store's video surveillance cameras showed one of the robbers wore a distinctive gray boot style shoe and was wearing black and white Easton batting gloves. Another robber was carrying a revolver with a wood handle, had on two-toned black and gray gloves, and was wearing a mask with a University of Missouri logo. The third robber was wearing a jacket with a gold eagle emblem on the back.

While entering the store, one of the suspects used a section of picket fence to prop open the door. Officers later discovered the section of fence was taken from a privacy fence located behind the gas station. While examining the fence behind the store, officers discovered a pack of Newport cigarettes and a knotted section of black t-shirt. Officers also recovered numerous bullet fragments and empty shell casings from the gas station.

*7-Eleven robbery*

The final robbery occurred at the 7-Eleven convenience store located at 4331 Shawnee Drive in Kansas City, Kansas. In the early morning hours of March 4, 2015, Dan Bayer was the only person working the overnight shift. Around 1 a.m., Officer Scott

Wood with the Wyandotte County Sheriff's Office came into the store. Officer Wood had just finished his work shift and stopped at the gas station on his way home. He was still in uniform and wearing his gun. After selecting some items, Officer Wood went to the checkout counter, where he struck up a conversation with Bayer.

The robbery began as the two were leaning on the counter and talking—Bayer facing the front door and Officer Wood facing away from the door. Three armed men dressed in black and wearing masks entered the store. They held their guns in the air, announced it was a robbery, and ordered Officer Wood to lie down on the ground. Bayer observed one of assailants was "noticeably taller" than the others. Before Officer Wood went to the ground, he was able to catch a glimpse of the men. He also described one of the men as "a bit stockier than the other two and a little bit taller."

One of the men came over the counter, grabbed Bayer's arm, and hit him in the head. Another suspect came around the counter while the other positioned himself over Officer Wood. The men ordered Bayer to open the cash register, and after he had done so, they had Bayer place the money in a bag. Bayer was then ordered to hand over his wallet, but when the suspects discovered there was no money in it, they returned it to Bayer. Bayer was then ordered to withdraw money from the store's safe. Bayer withdrew $60 and gave it to them. Two of the suspects wrestled the drawer out of the second register.

As two of the robbers dealt with Bayer, Officer Wood was lying on his stomach with his hands spread out in front of him. The third suspect held a knee to his back and told him that if he moved or tried anything, they would shoot and kill him. The man patted him down. Officer Wood tried to conceal his gun with his jacket, but to no avail; the suspect discovered the gun and tried to wrestle it from the holster. Unable to free the gun, the robber became frustrated and hit Officer Wood in the back of his head with an

object, causing Officer Wood to bleed. The holster strap eventually broke, and the suspect removed the gun. He also took Officer Wood's knife and wallet, which contained cash.

At this point, multiple gunshots were fired. Bayer could not tell which suspect fired the shots. Officer Wood later testified he could tell based on his training that a revolver and a semiautomatic handgun were being fired at the same time. Officer Wood first felt a pain in his jaw, and his mouth began to fill up with blood. He then felt pain in his right shoulder, left chest, and left abdomen.

Once the suspects fled the store, Officer Wood—who had remained conscious— radioed dispatch to report that he had been shot. Shortly thereafter, he lost consciousness. The treating trauma surgeon later testified that Officer Wood suffered gunshot wounds to his jaw, left and right shoulders, left chest, and right side of his neck. Officer Wood survived and testified at trial. His gun was later recovered in Clay County, Missouri.

The store's video surveillance revealed the shooter used a revolver with a wood handle. One of the robbers wore black and white Easton batting gloves; another wore dark gloves with a gold band; and the last suspect had on two-toned gloves. One robber wore gray boot style shoes.

*Investigation*

The initial lead came from Kansas City, Missouri, police officers who were able to lift a fingerprint from the pack of Newport cigarettes recovered from behind the Kicks 66. The print belonged to a young black male, Dyron King. Also located on the box of cigarettes was a State of Kansas tax stamp that was affixed by a distribution company. A detective working with the distribution company was able to determine from a code on

9

the stamp that the box was distributed to a group of vendors in the Kansas City, Kansas, area, which included the Family Dollar located at 1225 Quindaro.

Shortly after discovering the fingerprint, an investigator obtained the GPS location of King's cell phone. That evening, Kansas City, Kansas, and Kansas City, Missouri, officers—as well as various tactical response teams—arrived at 838 North 83rd Terrace in Kansas City, Kansas. When they knocked on the front door, King's mother answered, and one of the officers saw King in the front room of the home. Shortly thereafter, officers discovered two other young black males—Charles Bowser and Cecil Meggerson—in the home. All three were arrested.

Officers obtained a search warrant for the home. In King's downstairs bedroom, officers located three handguns, including a .357 magnum revolver on the bed. The revolver had a wood handle with a gold emblem. Behind a ceiling tile, officers found a bag containing a large amount of cash resting next to a MAC-style gun with an extended magazine. Resting on the floor were empty coin wrappers; a pair of blue and gray Nike boot style shoes, one with a drop of blood on it; an "improvised mask" that looked to be made from the sleeve of a t-shirt with a University of Missouri logo on it; and various liquor bottles, including Patron and Rémy Martin. A black hoodie, black pants, and a black jacket were also recovered from the bedroom.

Also in King's bedroom were the keys to a black Lincoln sedan that was parked in front of the house. Officers later learned the car belonged to Bowser. Inside the vehicle, officers recovered a pair of black and white Easton batting gloves; a pair of black gloves with a yellow stripe; a pair of two-toned gloves; a pair of black gloves; a bottle of Rémy Martin; a box of .357 bullets; and another "impromptu mask" that appeared to be made from a t-shirt.

Officers obtained a warrant to search Bowser's residence in Kansas City, Missouri. There they found a bottle of Patron in a dresser that also contained mail addressed to Bowser. Officers also located a coin wrapper behind a couch and a shirt matching the description of a shirt worn in the robbery of Don's Market and Liquors.

When officers booked Meggerson into jail, they took into evidence the clothing he was wearing, which included a pair of black Nike Air Max shoes. They also collected Meggerson's Nokia cellphone, which contained four photographs of Meggerson holding a bottle of Patron and a bottle of 1800 Tequila. The timestamps on the photos indicated they were taken at 11:50 p.m. on March 3, 2015.

Meggerson's cell phone contained text messages between him and "Dyron." One of the messages stated, "I need them 357," which was sent on March 4. A detective testified that he believed "357" referred to the .357 magnum revolver that was recovered from King's bedroom. Another text message from Dyron on February 28 stated, "Don't take it yet. We about to get money. Then we take it when we get a good L." The phone's call log indicated Dyron called Meggerson's phone three times on March 3, 2015.

In addition to Meggerson's phone, officers collected an LG cell phone from the living room floor at 838 North 83rd Terrace, and yet another cell phone was collected, though the record is unclear where it was found. An FBI special agent was able to determine one of the phones connected to the cellphone tower nearest the Family Dollar at 8:39 p.m. on March 3, 2015. The Family Dollar robbery occurred around 8:45 p.m. that day. The same agent also determined Meggerson's phone connected to the two cell phone towers nearest the Shamrock 10 times between 9:53 p.m. and 9:59 p.m. The Shamrock robbery occurred shortly after 10 p.m.

After listening to jailhouse phone calls made by Meggerson, officers obtained a warrant to search his girlfriend's apartment. There they found a shoebox containing a wallet with Meggerson's identification. Also in the shoebox were several items such as earrings, necklaces, and sunglasses with the price tags still attached.

During the course of the investigation, detectives obtained a DNA search warrant for all three suspects. DNA analysis from blood found on two spots from inside and outside the black and white Easton batting gloves revealed a mixture of a major and minor contributors. King was found to be the major contributor to both. Among three contributors to the DNA found inside the black and gray gloves found in the sedan, Meggerson's DNA was determined to be the major contributor. Of the four contributors to the DNA found in the black and yellow gloves, Bowser was the major contributor. Bowser was found to be the major contributor to three stains found on the University of Missouri mask. And Bowser was the major DNA contributor to the knotted fabric found behind the Kicks 66 gas station. King was found to be the major contributor of DNA located inside the blue and gray Nike boot style shoe. The blood found on the exterior of the shoe belonged to Foxworthy.

Swabbings from the revolver found in King's room revealed blood in one of the cylinder pin housings. The major DNA profile matched that of Officer Wood's to the probability of 1 in 520 octillion individuals. A firearms examiner compared shell casings recovered from the 7-Eleven, Family Dollar, and Shamrock robberies and was able to determine they were all fired from the same gun.

Investigators recovered footprints from the Kicks 66 gas station which were left behind on a 5-hour Energy box and a folded piece of paper. A forensic specialist determined the impression on the 5-hour Energy box could have been made by the blue and gray Nike boot style shoe recovered from King's bedroom. The same specialist

deduced the black Nike Air Max shoes recovered from Meggerson could have made the impression on the folded piece of paper.

While King was incarcerated at the Wyandotte County jail awaiting trial, he made statements to two different detention officers. On one occasion, a detention officer told King he could not leave his cell during a health and welfare check because the facility was on lockdown. King became agitated and started yelling at the officer, calling him a liar. When the detention officer told King there was nothing he could do about it, the officer walked to another cell. The officer testified he could still hear King tell another inmate, "I know that bitch is just lying to try and mess with me and he's pissed off that I shot one of his buddies and now he wants to get his."

Officer Jonathan Cortes testified about the second statement, which allegedly occurred over an intercom system used by officers and inmates to communicate with each other. King demanded access to a phone so he could speak with a sergeant. According to Officer Cortes, when he denied the requests, King yelled over the intercom that "he gets the phone and the sergeant . . . whenever he want[s] to because he shot a policeman and that [the officers] fear[] him." Officer Cortes claimed over the next two hours, King repeated multiple times that the officer was just mad because King "shot [his] boy." Officer Cortes also testified King said "he was gonna beat [his] ass and shoot [him]."

*Procedural posture*

The State charged King, Meggerson, and Bowser with attempted capital murder of Officer Wood, aggravated robbery of Patricia Pope (Family Dollar cashier); aggravated robbery of Reginald Jones (Family Dollar customer); aggravated robbery of Dan Bayer (7-Eleven clerk); aggravated robbery of Officer Wood; aggravated battery of Officer Wood; aggravated battery of Dan Bayer; conspiracy to commit aggravated robbery; and

13

two counts of criminal possession of a firearm. King was also charged with criminal threat toward Officer Cortes.

On December 9, 2015, King and Meggerson filed a joint motion to sever their trial from Bowser's. The motion stated the attorneys for King and Meggerson had received statements from two individuals who were incarcerated with Bowser. The statements allegedly indicated Bowser confessed to these individuals and explained in detail how the crimes were committed. However, before the court could consider the motion, Bowser received new counsel on January 8, 2016. At the pretrial motions hearing on January 15, 2016, Bowser's new counsel asked the court for a "continuance," explaining that he had been assigned to the case one week earlier and noting the large amount of discovery he had to review. The State did not object, and the court granted the request, telling Bowser's attorney that they would have to set a new hearing and trial date. Neither King nor Meggerson moved to sever their joint trial.

Ten days later, the court began a two-week jury trial of both King and Meggerson. The State called 74 witnesses and offered over 600 exhibits. The surveillance videos of each robbery were entered into evidence and viewed by the jury. Neither defendant presented evidence. The jury found King guilty as charged except for the aggravated robbery of Jones and the criminal threat to Officer Cortes. The jury also found Meggerson guilty as charged except for the aggravated robbery of Jones.

After denying King's motion for new trial, the court imposed a life sentence for the attempted capital murder and consecutive 449 months in prison for the remaining convictions. King appeals, and our jurisdiction is proper. See K.S.A. 2017 Supp. 22-3601(b)(3) (providing for direct appeal to the Supreme Court from a district court's final judgment when a maximum sentence of life imprisonment has been imposed).

14

*Sufficient evidence supports King's convictions.*

King's first challenge on appeal is to the sufficiency of the evidence to convict him. During closing arguments, his trial counsel conceded it was "obvious" most of the underlying crimes were committed but argued the State could not prove beyond a reasonable doubt that King was one of the robbers. He maintains the same position on appeal. In addition, King specifically challenges the evidence to support his conviction for conspiracy to commit aggravated robbery.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Woods*, 301 Kan. 852, 874, 348 P.3d 583 (2015) (quoting *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 [2014]).

The State presented—as the district court described it—"a boatload of circumstantial evidence" against the defendants. King keys in on the circumstantial nature of the evidence, believing it rendered the case against him "weak." Yet,

> "[T]his court makes no distinction between circumstantial and direct evidence in terms of probative value because '"[a] conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference."'" *State v. Robinson*, 306 Kan. 1012, 1023, 399 P.3d 194 (2017).

We hold there was sufficient evidence from which a rational fact-finder could have found beyond a reasonable doubt that King was one of the robbers. Among the vast

amounts of circumstantial evidence presented in this case—most of which we need not repeat here—some of the most probative is the DNA evidence. Officer Wood's DNA was found on the .357 revolver discovered on King's bed. King's DNA was found inside the blue and gray Nike boot style shoe. Foxworthy's blood on the shoe ties King to the Shamrock robbery. In addition, the same shoe's shoeprint matched that of the one found on the 5-hour Energy box from the Kicks 66 robbery. And the same style of shoe appears in every robbery. King's DNA was found inside the black and white Easton batting gloves, which also appeared in each robbery. In short, we hold a rational fact-finder could find King was one of the robbers beyond a reasonable doubt.

King makes a more nuanced argument concerning the evidence required to convict him of conspiracy to commit aggravated robbery. K.S.A. 2014 Supp. 21-5302(a) defines conspiracy as "an agreement with another person to commit a crime or to assist in committing a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by such person or by a co-conspirator." Conspiracy is comprised of two elements: "'(1) An agreement between two or more persons to commit or assist in committing a crime and (2) the commission by one or more of the conspirators of an overt act in furtherance of the object of the conspiracy.'" *State v. Hill*, 252 Kan. 637, 641, 847 P.2d 1267 (1993). Sufficient evidence must support each element of a crime. See *State v. Page*, 303 Kan. 548, 553, 363 P.3d 391 (2015).

King asserts the State did not sufficiently prove the existence of a formal agreement between himself and Meggerson. But Kansas law does not require the State to prove anything other than a tacit agreement: "'[I]t is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances. [Citation omitted.]'" *State v. Williams*, 299 Kan. 509, 529, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Stated another way: "'While an agreement is a necessary

16

element of a conspiracy, the existence of the agreement need not be proved directly but may be inferred from other facts proved. If one concurs in a conspiracy, no proof of an agreement to concur is necessary to establish his guilt.'" *State v. Sherry*, 233 Kan. 920, 934, 667 P.2d 367 (1983); see *State v. Schultz*, 252 Kan. 819, 843-44, 850 P.2d 818 (1993).

In addition to the strong circumstantial evidence of an agreement suggested by the mere fact of a coordinated string of robberies, the State presented evidence of a conspiracy through (1) a February 28 text message from Dyron that stated, "Don't take it yet. We about to get money. Then we take it when we get a good L"; (2) a March 4 text message between Meggerson and Dyron that stated, "I need them 357"; and (3) the existence of three phone calls made from Dyron's phone to Meggerson's phone on March 3.

King argues these texts are "cryptic and submitted out of any context." Admittedly, the comments do not provide direct proof of an agreement when viewed in isolation. But the messages make more sense when considering the totality of the facts submitted at trial—particularly considering the orchestrated nature of the robberies. See *State v. Swafford*, 257 Kan. 1023, 1040, 897 P.2d 1027 (1995) ("evidence of the manner in which the two prior robberies took place, shows planning between Anthony and Swafford for the present robbery"), *modified on other grounds* 257 Kan. 1099, 913 P.2d 196 (1996); *State v. Baker*, 249 Kan. 431, 452, 819 P.2d 1173 (1991) (girlfriend's description of home burglary established "that she and the defendant had, if not a mutual understanding, a tacit agreement to commit the crime of aggravated burglary"); see also *State v. Small*, 5 Kan. App. 2d 760, 763, 625 P.2d 1 (1981) ("It strains credulity to suggest that defendant repeatedly took merchandise through a store checkout stand without paying for it in the absence of some sort of prearrangement.").

Viewing all the evidence in a light most favorable to the State, we conclude there was sufficient evidence to convict King of conspiracy to commit aggravated robbery.

*The prosecutor committed nonprejudicial error in closing arguments.*

King next contends the prosecutor committed reversible error in several instances by using various qualifying phrases throughout closing arguments. The record reflects the prosecutor used the phrase, "I submit" 22 times; "we know" 36 times; "I believe" twice; "I think" twice; and "I don't think" once. King argues only some of these statements were error.

We utilize a two-step process to evaluate claims of prosecutorial error. First, to determine if the prosecutor erred, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Second, if there is error, the burden falls on the State to demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." 305 Kan. 88, Syl. ¶ 8.

Neither Meggerson's nor King's attorney objected to the prosecutor's argument. A timely objection is not a precondition for appellate review of a prosecutor's comments made during voir dire, opening statement, or closing argument. But defense counsel's objection—or its absence—may impact our analysis. *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017).

A prosecutor may argue the evidence demonstrates a defendant is guilty so long as the prosecutor does not state his or her personal opinion regarding the ultimate guilt or

18

innocence of the defendant. *State v. Mireles*, 297 Kan. 339, 368-69, 301 P.3d 677 (2013). "In general, a prosecutor may not offer a jury the prosecutor's personal opinion as to the credibility of a witness because such a comment is unsworn, unchecked testimony, not commentary on the evidence of the case. The determination of the truthfulness of a witness is for the jury." *State v. Akins*, 298 Kan. 592, Syl. ¶ 6, 315 P.3d 868 (2014).

Our decision in *State v. Charles*, 304 Kan. 158, 372 P.3d 1109 (2016), *abrogated on other grounds by State v. Huey*, 306 Kan. 1005, 399 P.3d 211 (2017), *petition for cert. filed* December 29, 2017, is instructive. There the prosecutor used the phrase "'I think' or its equivalent or their substantive opposites" more than a dozen times during closing arguments. 304 Kan. at 173. We were "troubled by these comments[] because, in short, the prosecutor's personal views are irrelevant to the task before the jury." 304 Kan. at 173. After citing to several Court of Appeals' opinions, the court found the prosecutor's uses of "I think" were "mere verbal tics" that were not outside the wide latitude afforded prosecutors. 304 Kan. at 174-75. However, we warned future prosecutors that they were:

> "on notice that any temptation to say 'I think' should be rebuffed and replaced with 'the evidence shows' or 'I submit' or a similar, less potentially subjectively loaded phrase. See *State v. Corbett*, 281 Kan. 294, 316, 130 P.3d 1179 (2006) (phrase 'I/we submit' used to advance idea for jury's consideration rather than expressing a personal opinion)." 304 Kan. at 175.

In *Corbett*, the prosecutor used the phrases "we know" and "I/we submit."

> "Each of the times the prosecutor used the phrase 'we know,' he was talking about uncontroverted evidence. The phrase 'we know' does not indicate his personal opinion, but demonstrates that the evidence was uncontroverted. Thus, the use of the phrase 'we know' under these facts is not improper. Likewise, each of the times the prosecutor used the phrase 'I/we submit,' he used the phrase to advance an idea for the jury's consideration

rather than expressing a personal opinion. Thus, the prosecutor's use of the phrase 'I/we submit' was not improper." *State v. Corbett*, 281 Kan. 294, 315-16, 130 P.3d 1179 (2006).

With *Charles* and *Corbett* in mind, we turn to the specific comments challenged by King.

*"I submit" statements*

King first objects to the following uses of "I submit":

- "I submit to you that the evidence presented to you is sufficient to prove that these two defendants, Dyron King and Cecil Meggerson, are guilty beyond a reasonable doubt of the crimes charged."

- "That gun is consistent with the gun that you can see the person with the . . . black and white Easton batting gloves, who I submit to you is Dyron King, entered Don's Liquor with."

- "And I submit to you that those are the same shoes that had Brenden Foxworthy's blood and the same shoes that have Dyron King's wearer DNA that were recovered in his bedroom."

- "[King is] in the jail and I submit to you he's bragging about what he did at the 7-Eleven when he shot Deputy Scott Wood."

- "I submit to you that the act that was committed against Deputy Wood was premeditated."

20

- "I would submit to you that using your common knowledge and experience, you have sufficient evidence as to both of these defendants to find beyond a reasonable doubt that they committed each of the crimes charged against them. Thank you."

Here the prosecutor properly phrased her arguments by advancing the State's case without injecting her personal opinion. Notably, Meggerson's attorney used the phrase "I submit" throughout closing arguments. This case illustrates why in *Charles* we directed future prosecutors to use "I submit." See *Charles*, 304 Kan. at 175; see also *United States v. Cessa*, 861 F.3d 121, 138 (5th Cir. 2017) ("By prefacing her evidentiary conclusion with the phrase 'I submit to you,' the prosecutor indicated to the jury that she was making an inferential argument using the evidence adduced at trial."). We find no error in the prosecutor's use of "I submit."

*"I believe" and "I think" statements*

King next challenges these three statements:

- "The next offense in Wyandotte County is early the next morning at the 7-eleven . . . . As soon as he saw those men, Deputy Scott Wood laid down on the floor in the prone position hoping that they wouldn't see his gun. Despite that, they took his gun from him, which you can see on the video. They then pistol whipped him. *I believe the evidence from the video shows that he was hit repeatedly with a gun.* He indicated to you that he was hit in the head with a blunt object and felt his mouth fill up with blood." (Emphasis added.)

- "*I think* there's sufficient evidence for you to find beyond a reasonable doubt that these two defendants, both Dyron King and Cecil Meggerson, committed the following crimes: . . . ." (Emphasis added.)

21

- "You've also heard testimony with regard to Mr. King's phone that he has one phone that was associated with him by the police and also associated in Mr. Meggerson's phone under the contact Dyron. He also possibly has another phone. He gave another phone number to law enforcement when they spoke to him. The fact that his phone doesn't ping near these locations, *I don't think that excludes him based on the evidence from having committed these crimes*." (Emphasis added.)

Rather than isolating a prosecutor's comment and analyzing it in the abstract, appellate courts question the comment in the context that it was made. *State v. Davis*, 306 Kan. 400, 413, 394 P.3d 817 (2017). Doing so, we discern the first use of "I believe" was a simple qualification where the prosecutor was unsure whether the video showed Officer Wood being struck with a gun. The prosecutor was not advancing her personal opinion, but simply hedging her statement as she was describing the evidence. Given the breadth of evidence submitted at trial, this comment was not error.

The second and third statements, however, are impermissible conveyances of the prosecutor's opinion to the jury. See *Charles*, 304 Kan. at 173, 175. Nonetheless, we decline to find the comments were error in this case because when the prosecutor made these statements at King's trial, we had not yet placed prosecutors on notice that such comments were improper. See *Charles*, 304 Kan. at 175; see *Sherman*, 305 Kan. at 117 (Prosecutors "must be evaluated based on the state of the law at the time of [the] trial.").

*"We know" statements*

Lastly, King claims the prosecutor committed error by using "we know" on three occasions:

- "Dyron King's DNA is in one of the Easton batting gloves that was recovered in Charles Bowser's Lincoln in the driveway of Dyron King's house. And we know

22

based on what you can see in all the videos and the still photos that have been taken that those Easton batting gloves are used in every robbery from Don's Liquor all the way to 7-Eleven."

- "And we know that Dyron King was [at the Shamrock] because Brenden Foxworthy's blood is on his gray Nike boot that was recovered from his bedroom."

- "And then we have to prove that they entered into each business armed with guns and shared in the proceeds. And I submit to you that that's clear. At a minimum, they shared in the liquor that was taken in the course of these robberies. We know that they shared in money. In Charles Bowser's house, there are coin wrappers recovered. In Dyron King's house, there were coin wrappers recovered. We know that coin was taken. We know that cash was taken."

Once again, *Corbett* instructs us that a prosecutor's use of "we know" is acceptable when it "does not indicate [the prosecutor's] personal opinion, but demonstrates that the evidence was uncontroverted." 281 Kan. at 315. In this case, the prosecutor was drawing inferences for the jury, not stating uncontroverted evidence. Thus all three uses of "we know" were error, even if the inferences being drawn were reasonable. See *State v. Brown*, No. 111,161, 2015 WL 1782656, at *5 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1079 (2016) ("[D]rawing reasonable inferences from the evidence through the use of a phrase containing the word 'we' appears to run counter to *Corbett*[.]"); *Morgan v. State*, No. 109,099, 2014 WL 5609935, at *10 (Kan. App. 2014) (unpublished opinion) ("Attaching the phrase ['we know'] to specific facts in a case, except for obviously uncontroverted ones . . . may be problematic. Neither defense counsel nor the jurors may share the prosecution's view of just what has been disputed in the evidence.").

Having found three instances of prosecutorial error, we must turn to the question of prejudice. The State must demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 305 Kan. 88, Syl. ¶ 8. The State claims any prosecutorial error is harmless beyond a reasonable doubt primarily because the evidence in this case was overwhelming. While it is true that the evidence overwhelmingly indicates King was one of the robbers, we expressly warned against such reasoning in *Sherman*:

> "The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry. As has often been repeated, prejudice can exist even 'in a strong case.' [Citation omitted.]" 305 Kan. at 111.

Nonetheless, review of the prosecutor's entire closing argument convinces us that the error was harmless beyond a reasonable doubt. The inferences the prosecutor was asking the jury to draw when she erred were reasonable and made compelling by the evidence. We are convinced the jury would have drawn those same inferences even absent the prosecutorial error. Moreover, during rebuttal, the prosecutor more appropriately presented the same evidence to the jury:

> "[W]hen you consider the evidence against [King] . . . one of the things to keep in mind is that you can use your common knowledge and experience when determining whether or not you believe the evidence proves that both of these defendants are guilty beyond a reasonable doubt.
>
>     . . . .
>
> "In Dyron King's bedroom with a bunch of other large shoes, which you can see in the photos, are a pair of size 13 gray Nike boots. Those boots have the blood of

Brenden Foxworthy on them. You can ask yourself and use your common knowledge and experience is that a coincidence?

. . . .

"Use your common knowledge and experience. He matches the description of suspect number one. His DNA is on the boots with Brenden Foxworthy's blood. His DNA is on the gloves and you've also got the revolver on his bed with Deputy Wood's blood. That would have to be a really unfortunate coincidence."

Given the length and complexity of the case, as well as the voluminous evidence presented to the jury, we are convinced these comments were "minor aberrations in a prolonged trial." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 (1940). That is, there is no reasonable possibility the prosecutor's comments contributed to the verdict.

*King waived any request to sever his trial from Meggerson's.*

King's final substantive claim is that he should have been tried separately from Meggerson. During closing arguments, Meggerson's attorney, James Spies, made statements suggesting the jury could convict King and acquit Meggerson. Spies emphasized that the evidence found at King's residence was not on Meggerson's person. And at one point, Spies told the jury that "[t]he evidence is clear against Dyron and Charles. The evidence is circumstantial and lacking against Cecil Meggerson." King's counsel neither objected to these comments nor asked to have King's trial severed from Meggerson's before the jury returned its verdict.

Within two weeks of the jury verdict, King moved for a new trial, arguing in part that Spies' closing arguments—without warning—shifted Meggerson's defense from simply holding the State to its burden of proof to pitting King against both the State and

25

Meggerson. King complained that if Spies "intended to make such statements or have adverse defenses[,] he should have asked for separate trials." During argument on the motion, King's attorney again stated it was Spies' duty to request a separate trial if he wanted to make such arguments. The district court denied the motion, finding that the statements were not inflammatory and were in response to evidence presented.

In Kansas, "[t]wo or more defendants may be charged in the same complaint, information or indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting the crime or crimes." K.S.A. 22-3202(3). However, "[w]hen two or more defendants are jointly charged with any crime, the court may order a separate trial for any one defendant *when requested by such defendant or by the prosecuting attorney*." (Emphasis added.) K.S.A. 22-3204.

The State argues King waived his ability to seek severance by failing to comply with K.S.A. 22-3204. King did not object to Spies' closing arguments. At no point before or during trial did King move to sever. The first and only time King asked for severance was in his motion for new trial. The plain language of K.S.A. 22-3204 indicates a prosecuting attorney or defendant must request a severance. Indeed, our caselaw holds that when a defendant fails to request a severance under the statute, the defendant waives his or her ability to seek severance. See *State v. Bryant*, 276 Kan. 485, 495, 78 P.3d 462 (2003), *abrogated on other grounds by State v. Gleason*, 277 Kan. 624, 88 P.3d 218 (2004); *State v. Pham*, 234 Kan. 649, 651, 675 P.2d 848 (1984); *State v. Jones*, 222 Kan. 56, 58, 563 P.2d 1021 (1977); *State v. Daugherty*, 221 Kan. 612, 618, 562 P.2d 42 (1977); see also *The State v. Madden*, 90 Kan. 736, 741, 136 P. 327 (1913).

For instance, the defendant in *Bryant* waited until he filed a motion for new trial to argue he should have been tried separately from his codefendant. We summarily dismissed Bryant's claim, simply holding such a delay constituted a waiver. See 276 Kan. at 495. Presented with identical facts, we now hold King waived his ability to seek

26

severance. Hence, the district court properly denied King's motion for new trial, albeit for the wrong reason. See *State v. Cotton*, 306 Kan. 156, 160, 392 P.3d 116 (2017).

*Cumulative error did not deprive King of a fair trial.*

> "'Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. [Citation omitted.]'" *State v. Carter*, 305 Kan. 139, 166, 380 P.3d 189 (2016).

King argues cumulative trial error necessitates a new trial. But the only errors we have found are the prosecutor's limited use of "we know" in her closing argument. These errors were harmless beyond a reasonable doubt when considered individually, and the result does not change when their aggregate effect is weighed.

Affirmed.